5 N.Y.2d 557 (1959)
56-70 58th Street Holding Corp., Appellant,
v.
Fedders-Quigan Corporation, Respondent.
Court of Appeals of the State of New York.
Submitted January 7, 1959.
Decided April 17, 1959.
Mario M. Cuomo, Nicholas S. Maltese and Vito J. Titone for appellant.
Samuel R. Rudey, Arthur Sheinberg and Howard Modlin for respondent.
Chief Judge CONWAY and Judge VAN VOORHIS concur with Judge FROESSEL; Judge FULD concurs in a separate opinion; Judge BURKE dissents in an opinion in which Judges DESMOND and DYE concur.
*559 FROESSEL, J.
On March 1, 1953 the parties entered into a written lease whereby the tenant rented the basement and first floor of a building owned by the landlord for a period of two years at an annual rental of $18,000, payable in monthly installments of $1,500. The lease stated that the premises were "to be used and occupied by the Tenant for warehousing and shipping of its goods", although it nowhere designated the nature and type of those "goods". Paragraph 39 of the lease obligated the landlord to make specified alterations and improvements in the premises "with reasonable promptness after the execution of this lease", including concreting the basement floor, driveway and certain retaining walls, reconstructing and repairing the existing loading platform and cutting new openings for 8-foot doors. It made these promptly for the accommodation of the tenant.
The certificate of occupancy then in effect permitted the first floor of the leased premises to be used as a dance hall; the alteration application later made to and approved by the Department of Housing and Buildings showed the existing legal use of the basement to be "Boiler Rm & Storage". Notwithstanding the fact that, under section C26-185.0 of the Administrative Code of the City of New York, it was "unlawful to make any changes of occupancy or use of any structure if such change is inconsistent with the last issued certificate of occupancy", the tenant, who "couldn't wait", immediately entered into possession.
In paragraph 43 of the lease, the landlord covenanted to "make such application as may be necessary" to obtain a certificate of occupancy authorizing the use of the demised premises for warehousing and shipping. No time was fixed for *560 performance of this covenant, but paragraph 48 of the lease provided that if a certificate were refused by the Department of Housing and Buildings, "after the landlord has exhausted all remedies to compel [its] issuance", the tenant could vacate the premises within 60 days after notice from the landlord, and the lease would be at an end.
Before a new certificate of occupancy will issue for an altered building whose use is to be changed, plans must be submitted to and approved by the Building Superintendent, pursuant to section C26-161.0 of the Administrative Code, and the alterations effected in accordance with the approved plans (§§ C26-187.0, C26-188.0). Accordingly, the landlord promptly retained an architect, plans were drawn up and approved, and, as noted, all the alterations specified in paragraph 39 of the lease were completed. Various alleged difficulties then ensued, including the illness and death of the architect and the filing of amendments to the approved plans by a new architect, and at the expiration of 14 months a new certificate had still not been issued. During this entire period, however, no violations were placed against the premises by any official agency, and the tenant made full use of them for the purposes specified in the lease.
Despite the fact that its possession was wholly undisturbed, the tenant, by letter dated April 27, 1954, informed the landlord that if a new certificate of occupancy was not forthcoming by June 30th it would deem the lease terminated, vacate the premises and cease paying rent. The landlord then contacted the Building Department and a building inspector visited the premises in the middle of June. On June 25th, five days before the deadline set by the tenant, the Building Department notified the landlord that approval of his application for a new certificate was being "held up" because of the storage of combustibles on the premises. The landlord's application had stated that incombustible materials were being stored, and it was informed that the application would have to be amended or the combustibles removed.
Although the tenant adduced evidence that it had always stored combustibles on the premises, the landlord's manager claimed that all he had ever seen were assembly line parts, and that from May on the tenant was storing "less and less". In *561 any event, the landlord's manager visited the premises on June 25th or 26th and found that they were completely empty, with the exception of two dollies with paint cans on them and one barrel of salvarasaul, used for diluting paint. Application was immediately made to the Fire Department for permission to store combustibles (New York City Charter, § 646, subd. e), and the landlord was assured that it would be approved as quickly as possible.
The following day, however, the landlord's manager returned to the premises and found that the combustibles had been removed, thus leaving the premises entirely vacant. The application filed with the Fire Department was hence withdrawn, and a new certificate of occupancy, authorizing the use of the first floor as well as the basement for storage and shipping, was duly issued on July 8th. It was thus established that the premises were in such condition before June 30th as to entitle the landlord to a certificate of occupancy at that time. No rent was paid by the tenant after July 1st.
In awarding judgment to the landlord for rent due for the balance of the lease term, the trial court ruled in part that the tenant "could not simply vacate the premises in cavalier fashion * * * on the pretext that further occupancy was illegal". The Appellate Division reversed, by a divided court, on the ground that "the covenants to obtain the certificate and to pay the rent were dependent. The landlord, having failed to perform that condition of the lease upon its part, may not recover the rent reserved". The question posed is whether the landlord's failure to obtain the new certificate of occupancy by June 30th justified the tenant in vacating the premises.
We agree with the trial court that, "under all the circumstances herein disclosed", the tenant's removal was not justified. The lease itself was not void for illegality merely because the use of part of the premises for warehousing and shipping was not authorized under the then existing certificate of occupancy. As the court noted in Elkar Realty Corp. v. Kamada (6 A D 2d 155, 157), the lease "contemplated a correct and hence a lawfully occupied premises" and "the bar to legal use was * * * readily correctible" (see, also, Minton v. Schulte, Inc., 153 Misc. 195; Mesfree Realty Corp. v. Huyler's, 153 Misc. 667). The tenant knew, when it signed the lease and *562 immediately entered into possession, that plans had to be drawn and approved and the specified alterations completed before a new certificate would issue. By providing that the landlord was to be afforded the opportunity to "exhaust all remedies" to obtain the certificate, the lease, in practical effect, fixed such event as the period for performance. The landlord had admittedly not exhausted his remedies and, in light of the fact that the tenant's possession and use of the premises were wholly undisturbed, we do not think the tenant was justified in moving therefrom.
Moreover, a certificate authorizing the use of the entire leased premises for storage and shipping would have been issued by the date specified had it not been for the tenant's storage of combustibles. The tenant claims this would have been no performance at all, since the lease authorized it to store its "goods", that those "goods" included paints and thinners, and the certificate issued one week later did not authorize the storage of such combustibles. The salient fact, however, is that the tenant offered no evidence that the building was not sufficiently equipped to permit the storage of combustibles. So far as appears from the record, the only thing that was "holding up" the issuance of a suitable certificate was the approval of the Fire Commissioner, and the landlord immediately made application therefor upon being informed of the presence of combustibles.
Inasmuch as the lease did not specify the nature of the goods to be stored, and there is no evidence that the landlord knew of the storage of combustibles prior to being informed on June 25th by the Building Department, we agree with the trial court that the landlord "should then have been afforded a reasonable opportunity to obtain a certificate of occupancy upon the basis of storage of combustibles". Not only did the tenant fail to inquire into the status of the pending application for a certificate of occupancy after fixing the date for performance, but it had apparently begun to move out in May and had completely vacated the premises, except for some combustibles, prior to the deadline set. In the light of such apparent lack of good faith and the circumstances outlined, we are unable to conclude that the landlord failed to perform its covenant "within a reasonable specified time" (Taylor v. Goelet, 208 N.Y. 253, 260; Valashinas v. Koniuto, 308 N.Y. 233, 239).
*563 Even assuming the landlord did breach its covenant, such breach did not entitle the tenant to vacate the premises and cease paying rent. In Rosenthal Paper Co. v. National Folding Box & Paper Co. (226 N.Y. 313), cited by the Appellate Division, this court stated (p. 320): "By a long series of decisions, the rule has been established that the question whether covenants are to be held dependent or independent of each other is to be determined by the intention and meaning of the parties, as expressed by them, and by the application of common sense to each case submitted for adjudication." (See, also, Rosenwasser v. Blyn Shoes, 246 N.Y. 340, 346.) Here, as in the Rosenthal case, "the intention of the parties is not obscure" (226 N. Y., p. 320). Not only did the lease fail to expressly condition the continued payment of rent upon the landlord's procurement of a suitable certificate, which of itself is highly significant (Raner v. Goldberg, 244 N.Y. 438, 441-442; Robitzek Inv. Co. v. Colonial Beacon Oil Co., 265 App. Div. 749, 753, motion for leave to appeal denied 291 N.Y. 831), but it made clear in paragraph 48 that only in the event a certificate was "refused" were the parties to be released from "any and all further liability to [each] other". That provision of the lease, in addition to making it clear that the landlord was to be permitted time to "exhaust all remedies" to obtain the certificate, expressly conferred on the landlord, not on the tenant, the right to cancel the lease "if through no fault of the landlord such Certificate of Occupancy is refused by the Department of Housing and Buildings". (Emphasis supplied.)
Reading paragraph 48 most favorably to the tenant, it, as opposed to the landlord, would have the right to treat the lease as at an end if a certificate was refused due to the fault of the landlord. As noted by the trial court, however, "the certificate of occupancy was not refused but was `held up' because combustible materials were stored on the premises by the defendant" (emphasis supplied), and there is no evidence in the record that the leased premises failed to comply with any applicable building or safety regulations which might have resulted in a refusal to issue a suitable certificate.
In Raner v. Goldberg (supra), where this court held that a tenant could not recover sums paid as a deposit and as rent on the ground that the refusal of a public official to grant him a *564 license precluded him from lawfully using the premises for the purpose for which they were leased, we stated (244 N. Y., p. 442): "The lessee might have refused to pay rent except on condition that the license would be granted. The lessor might have refused to make a contract to lease including in its terms provision for making repairs and alterations if the lessee had annexed a condition to his promise to pay rent. The lessee chose to make [an] unconditional promise. The lessor's promise was made in return. We may not now imply a condition which the parties chose not to insert in their contract, nor hold that anticipated grant of a license constituted the foundation of the contract". The tenant is in a far weaker position here, since there was no incurable obstacle to the issuance of a suitable certificate and no one interfered with its use, occupancy and full enjoyment of the premises during the entire time it was in possession.
The only remaining ground that would justify the tenant's unilateral cancellation of the lease would be that the landlord's failure to procure the certificate was tantamount to a constructive eviction. To successfully maintain this defense, however, in an action for rent, a tenant must show that the acts of the landlord precluded him from "the beneficial enjoyment of the property" (Herstein v. Columbia Pictures Corp., 4 N Y 2d 117, 120-121). The "reason for the rule", as stated by us in the Herstein case, "is that there was a failure of consideration  the tenant was deprived of the premises by the wrongful act of the landlord".
In the instant case, as already noted, the failure of the landlord to procure a new certificate of occupancy in no way interfered with the tenant's beneficial enjoyment of the premises. The landlord promptly made the alterations the tenant required and no violations, complaints, notices or obligations were ever directed to the tenant in the year and four months during which it occupied the premises. Since it received and exercised all its rights under the lease, there was no such failure of consideration as would excuse the payment of rent (see Robitzek Inv. Co. v. Colonial Beacon Oil Co., supra; First Nat. Bank of New Rochelle v. Fairchester Oil Co., 267 App. Div. 281, 782, affd. 292 N.Y. 694).
*565 The tenant relies heavily on Hizington v. Eldred Refining Co. (235 App. Div. 486) and De Angelis v. White-All Corp. (273 App. Div. 873) to justify its abandonment of the premises. In both those cases, however, it was impossible for the tenant lawfully to use the premises for the purpose contemplated in the lease. The former involved an incurable proscription against the use of the premises as a gas station while, in the latter, the tenant could not secure a license to conduct a billiard parlor until a new certificate of occupancy was issued, and the lease expressly prohibited the use of the premises for any purpose not provided for in the existing certificate. Here, there was no such substantial impairment of possession and no real frustration of the lease. All that was lacking was the documentary evidence of the building's suitability for the uses to which it was completely being put.
Finally, the tenant argues that since continued use of the premises for storage and shipping was unlawful, it "was not required to await prosecution for such violation" before vacating the premises. Under section C26-204.0 of the Administrative Code, however, no person who as here occupies and uses a structure in a manner inconsistent with the last-issued certificate of occupancy (§ C26-185.0, supra) may be subjected to "any action or proceeding and any punishment" until "after having been duly notified as provided in this title that * * * the occupancy or use thereof" is in violation of law. (Emphasis mine.) It is only for certain serious violations (§ C26-204.0, supra, subd. a, pars. 1-4), such as one producing "an imminent hazard to persons or property by reason of a change of occupancy or use without a permit", that one may be exposed to civil and criminal sanctions "without prior notification that a violation exists" (id.). There is no evidence of any such serious violation here.
To the extent that the Appellate Division reversed "the findings of fact contained in the opinion of the trial court, insofar as they may be inconsistent" with its own opinion, we have concluded that the weight of the evidence is with the findings of the trial court. The judgment of the Appellate Division should be reversed and that of Trial Term reinstated, with costs in this court and in the Appellate Division.
*566 FULD, J. (concurring).
Although I am of the opinion that the landlord's covenant to obtain a certificate of occupancy and the tenant's covenant to pay rent were dependent, I am for reversal  solely on the ground, however, that the tenant in this case waived its right to demand timely compliance by the landlord. The certificate was actually procured on July 8, 1954, just nine days after the deadline date specified by the tenant and the delay between the beginning of the lease term and the obtaining of the certificate, though long, left the tenant's possession wholly undisturbed. In the light of such facts and in view of the other peculiar circumstances present, the tenant was not entitled to insist upon a certificate by June 30, 1948.
BURKE, J. (dissenting).
The claim here is solely to recover rental for a period when the tenant was no longer in occupancy.
By a covenant, in a two-year lease commencing March, 1953, the landlord assumed the burden of obtaining a certificate of occupancy covering the use of the premises "by the Tenant for warehousing and shipping of its goods". At the time, therefore, that the lease was made, the new use authorized under the lease concededly was unlawful (Administrative Code of City of New York, § C26-185.0; Shontz Co. v. Laffay, 225 App. Div. 263).
The documentary proof shows that the application for a certificate of occupancy was not dated nor filed until June, 1954, after a delay of 14 months. During the period from March, 1953 until April, 1954, a representative of the tenant complained repeatedly to the landlord in regard to the delay and reminded the landlord of its neglect to secure the certificate of occupancy as agreed. When the tenant's patience had worn thin, a written notice was sent on April 27, 1954 to the landlord stating that the certificate of occupancy had not been granted as required by the lease, and that the continued occupancy by the tenant for the uses authorized by the lease would be in contravention of law. The landlord was informed that, unless a certificate of occupancy was issued in accordance with the landlord's undertaking in the lease, the defendant would quit and remove from the premises on June 30, 1954 and deem that the date of the termination of the lease and its obligation to pay any rent for any subsequent period. No certificate of occupancy authorizing the use of the premises for the purposes described in the lease *567 was obtained or granted, and the tenant vacated the premises and surrendered possession of the premises on June 30, 1954 and has not been in possession or occupancy since that date.
A mere recital of the facts reveals the failure of the landlord to use due diligence to obtain the certificate of occupancy despite the prodding from the tenant.
When no time for performance of the obligation of obtaining a certificate of occupancy is fixed in a lease, a landlord is ordinarily entitled to a reasonable time within which he may comply with such a covenant.
In this case the obligation to exhaust all available remedies to secure the certificate was the landlord's. Nevertheless, the landlord took no effective action until after the written demand had been made. In granting more than a year of grace, the tenant gave the landlord more than a reasonable opportunity to secure the certificate of occupancy. The failure to secure the certificate resulted in a continued unlawful occupancy of the premises, constituting a breach of the covenant. Such a breach of an essential term of a lease prevents any recovery of the rent reserved in the lease, after the tenant has abandoned the demised premises.
Under the construction of the lease adopted by the majority opinion, the tenant would be obliged to pay rent for the entire term of the lease without regard to the landlord's expressed agreement to provide premises which might be lawfully used and occupied. We believe that the obligation to pay rent was dependent upon the covenant to obtain the certificate. The landlord has failed to perform at any time prior to the expiration of the time set in the 60-day notice. It should not now be allowed to recover the rent claimed for nonoccupancy. (Hizington v. Eldred Refining Co., 235 App. Div. 486; De Angelis v. White-All Corp., 273 App. Div. 873.)
The contention that the tenant was responsible for the delay in the issuance of the certificate of occupancy is, of course, frivolous. The lease provided that the demised premises were to be "used and occupied by the Tenant for warehousing and shipping of its goods". The landlord knew at the time the lease was made that the tenant's goods included inventories of paints and thinners, the combustibles referred to in the opinion of the trial court. The landlord recognized the presence of the *568 inventories of paints and thinners among the goods of the tenant in its application to the Fire Department to include combustibles. This application was withdrawn, and no further effort was made to comply with the law in that regard. The final issuance of the certificate on July 8, 1954 resulted solely from the fact that the defendant had vacated the premises and removed its goods. The certificate of occupancy then issued was without meaning as the landlord had made no attempt to secure the certificate of occupancy authorizing the storage of the tenant's goods and combustibles. The tenant did nothing other than what it was permitted to do under the lease throughout the entire time of its occupancy.
The conduct of the tenant and the excuses of the landlord show that the parties intended that if the tenant did not have the right to use the premises lawfully and did not occupy them, it should not pay rent for them (cf. Rosenthal Paper Co. v. National Folding Box & Paper Co., 226 N.Y. 313, 320, 321).
The plaintiff's position that it had not exhausted all remedies, and, in effect, that the tenant was required to continue in unlawful possession even if it took the plaintiff the balance of the term to exhaust all available remedies, is patently a sham in the light of the facts developed at the trial. Instead of proceeding diligently to pursue all available remedies, the landlord did not even approach the municipal authorities until it was spurred into action by the summary notice of termination of the lease served by the tenant. Its unreasonable delay and its negligence in seeking a restricted certificate of occupancy denote an intention to evade the obligation assumed under the terms of the lease.
Here there was no waiver of performance of the provision relating to the certificate of occupancy. The tenant had on numerous occasions pressed the landlord to take action. Finally realizing the excuses given by the landlord were not bona fide, the tenant served the notice on the landlord hoping thereby to compel the landlord to secure a proper certificate of occupancy. (Cf. Krausi v. Fife, 120 App. Div. 490; Marks v. Dellaglio, 56 App. Div. 299.) The landlord, faced with the termination of the lease, pretended to comply by filing an improper application which failed to disclose the nature of the tenant's goods which were to be warehoused on the premises even though it was *569 acquainted with the character of the tenant's business. Under the circumstances the tenant was justified in asserting a constructive eviction against the claim for rent due after the abandonment of the premises. The constructive eviction occurred before the rent became due. (Herstein v. Columbia Pictures Corp., 4 N Y 2d 117.)
Accordingly, the judgment of the Appellate Division dismissing the complaint should be affirmed.
Judgment reversed, etc.