JOHN T. WESSON, trustee,[1] *vs.* LEONE ENTERPRISES, INC.,
& another.[2]

Essex. May 9, 2002. - September 9, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Real Property*, Lease. *Landlord and Tenant,* Lease as contract, Constructive
   eviction, Quiet enjoyment, Dependence of obligations. *Contract,* Lease of
   real estate. *Practice, Civil,* Findings by judge.

In a proceeding arising from a dispute between a landlord and tenant over a
   leaking roof in the demised premises, there was insufficient evidence to
   support the tenant's claim of constructive eviction where, although the
   judge's implicit finding that it was the landlord's obligation under the lease
   to keep the roof in good repair was supported by the evidence, the tenant
   failed to prove that the leaks made the premises untenantable for the
   purposes for which they were used. [713-715]
Discussion of the common-law principles of dependent and independent
   covenants in commercial and residential leases. [715-719]
This court abandoned the common-law rule of independent covenants in com-
   mercial leases in favor of the modern rule of mutually dependent covenants
   as reflected in the Restatement (Second) of Property (Landlord and Tenant)
   § 7.1 (1977). [719-721]
This court, having adopted a rule of mutually dependent covenants in com-
   mercial leases, concluded that a landlord's failure to keep the roof of his
   building in good repair deprived its tenant of a substantial benefit
   significant to the purpose for which the lease was entered and, consequently,
   that the tenant had the right to terminate its lease and recover reasonable
   relocation costs. [721-722]

CIVIL ACTION commenced in the Salem Division of the District
Court Department on December 18, 1991.

On transfer to the Superior Court Department, the case was
heard by *Nancy S. Merrick,* J.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Michael Roitman* for the plaintiff.

---

[1]Of Wesson Realty Trust.

[2]Joseph A. Leone. We shall refer to a single defendant tenant.

*Walter H. McLaughlin, Jr. (Eugene S. Summers* with him) for the defendants.

CORDY, J. In this case, we abandon the common-law rule of independent covenants in commercial leases in favor of the modern rule of mutually dependent covenants as reflected in the Restatement (Second) of Property (Landlord and Tenant) § 7.1 (1977). In applying the rule of mutually dependent covenants to the facts present in this case, we conclude that a landlord's failure to keep the roof of his building in good repair deprived the tenant of a substantial benefit significant to the purpose for which the lease was entered. Consequently, the tenant had the right to terminate the lease and recover reasonable relocation costs.

1. *Background.* The plaintiff landlord, John T. Wesson, trustee of Wesson Realty Trust, owned a multi-tenanted commercial building located in Danvers (Wesson building), in which the defendant tenant, Leone Enterprises, Inc., a financial printing company, rented space. The lease ran for five years, commencing on March 31, 1988.[3]

The tenant first complained to the landlord about "significant leaks in the roof" in April, 1991.[4] The parties met soon afterward and the tenant pointed out "more than one," but less than five, leaks in the premises. The landlord agreed to fix the roof and called on his son, Wayne Wesson, who periodically managed the building, to oversee the repairs. Wayne patched the roof himself. The leaks reappeared later that spring, and the landlord hired a professional roofing contractor to make further repairs.

In early August, 1991, the roof began leaking in some of the same places previously repaired. The tenant complained several

---

[3]The initial rent for the 12,000 square foot space was $8,186 per month ($6,250 per month in base rent plus thirty-four per cent of the operating fees and expenses of the Wesson building). The tenant was required to indemnify the landlord "against all loss of rent and other payments which the LESSOR may incur" if the lease was terminated.

[4]At trial, the tenant testified that there had been leaks before this time but that he had not complained "because [he] never thought they were a problem or an issue that [he] should be worried about."

times to the landlord and Wayne about the leaks, and claimed that he and his subtenant[5] were "forced to take necessary precautions to protect [their] businesses from more water damage."[6] After these leaks were repaired by the landlord, the tenant notified him of another leak "in a different location" on September 6, 1991. This particular leak, however, was caused by a defective electrical conduit connected to the roof-top air conditioning unit, the maintenance of which was the tenant's responsibility under the lease.[7] The landlord had the roof inspected the next day by a professional roofer, who sealed the leak. There was no evidence at trial of any additional leaks or complaints of leaks after September 7, 1991.[8]

On November 4, 1991, the tenant notified the landlord that he would be "vacating the premises on or before December 31, 1991,"[9] for reasons "well known to you. The constant lack of

---

[5]MicroNational Inc. sublet one-half of the tenant's space in the Wesson Building from July 1, 1991, through the end of the lease term. MicroNational paid $3,500 per month directly to the landlord until it "went into bankruptcy" and paid only $2,323 per month from June, 1992, through December, 1992.

[6]The evidence at trial of "precautions" taken by the tenant was the covering of his equipment and stock with plastic sheeting. There was no evidence introduced of any precautions taken by the subtenant.

[7]The lease required the tenant to "maintain all equipment of any nature located within the demised area including, but without limitation, lighting, heating, air conditioning, plumbing, and the air conditioning units which service the demised premises and are located on the roof of the building of which the demised premises is a part. The LESSEE shall be responsible for the heating and air conditioning of the demised premises."

[8]In her findings of fact, the trial judge found that the tenant had complained about leaks in the roof by telephone and letter "from April 1991, through November of 1991." There was no evidence at trial, however, of any complaints made by the tenant to the landlord after September 6, 1991. The only evidence of communication between the tenant and the landlord about roof leaks between September 7, 1991, and the tenant's letter of November 4, 1991 (notifying landlord of tenant's intent to vacate the premises) is a letter from the landlord to the tenant dated October 2, 1991, stating in relevant part that "[w]e have had several good rainstorms since [the September repair] and nothing has leaked." Neither the contents nor the receipt of the letter was disputed by the tenant at trial.

[9]The tenant leased alternative space in Ipswich in November, 1991. The new lease, for 7,200 square feet at $3,000 per month, became effective on November 1, 1991.

minimal heat as well as the serious leakage problem."[10] The tenant also paid rent in full through the end of 1991.

The landlord filed a complaint in the District Court alleging breach of contract and damage to the demised premises.[11] The case was transferred to the Superior Court on January 22, 1992. The tenant filed counterclaims for constructive eviction and deceptive business practices under G. L. c. 93A, § 11. The landlord then amended his complaint to add a claim against the tenant for interference with advantageous relations.[12]

A jury-waived trial on the claims for breach of contract, interference with advantageous relations, and constructive eviction was held on November 24 and 25, 1997. After hearing testimony from the landlord, Wayne Wesson, the tenant, and the architect who designed the Wesson Building, the judge found the tenant's testimony "regarding the frequency of his complaints about the leaky roof, the danger it posed upon his equipment and inventory and that he was forced to move out to be credible." In contrast, the judge found the testimony of Wayne Wesson and the landlord "regarding their reasonable responses to whatever complaints they received about the leaking roof not credible." The judge further found that "the roof was in a state of disrepair and needed more than spot repairs"; that "whether Wayne or a professional roofer attempted the

---

[10]In addition to leaks, the tenant had also complained about problems with the building's heating system from September, 1989, through January, 1990. In January and February, 1991, attorneys for the plaintiff and the tenant exchanged correspondence about the heating system problems and the tenant's request for a rent reduction. Effective March 1, 1991, the parties agreed to reduce the total monthly rent to $7,000 through the end of the lease. The problems with the heating system are not an issue on appeal because, "while the parties litigated the issue of whether or not the lack of heat constituted a constructive eviction, [the tenant] conceded at the close of the evidence that the reduction in rent resolved this issue."

[11]The landlord alleged $5,500 in physical damages to the premises, including "damage . . . caused by a forklift, and ink stains on the floor." The judge found that the actual cost to repair the damages was "unclear," and that the damage sustained was not "beyond normal 'wear and tear.' "

[12]According to the landlord, tenant threatened to inform the landlord's mortgagee of "various alleged breaches of the mortgage covenants" and "alleged statements made by [the landlord] . . . to induce the mortgagee to make the loan" if the landlord did not dismiss the complaint. Although the landlord presented evidence of this claim at trial, no damages were proved and the judge dismissed the claim.

repairs, the methods used were shoddy and unsuccessful"; and that, "from April 1991 through November of 1991 [but see note 8, *supra*], [the tenant] complained to both [the landlord] and [Wayne] by telephone and by letter that the roof leaked and put his business at risk." Based on these findings, the judge concluded that the tenant had been constructively evicted from the premises by the landlord's failure to adequately repair the roof and was therefore relieved of its obligation to pay rent. Alternatively, she held that, even if the tenant had not been constructively evicted, the tenant could have lawfully withheld the rent under the dependent covenants rule, where the landlord had failed to provide a "dry space," a service "essential" to the lease.

Judgment entered in favor of the defendant tenant on the plaintiff landlord's breach of contract claim and on the tenant's counterclaim of constructive eviction. Relocation damages in the amount of $1,063 were awarded to the tenant.[13] The landlord appealed, claiming the trial judge erred in (1) concluding that there was sufficient evidence to support the constructive eviction claim; and (2) applying the "dependent covenants" rule to the parties' commercial lease. We transferred the case to this court on our own motion.

We affirm the judgment for the defendant tenant, but for reasons different from those of the Superior Court judge. The judge's finding of constructive eviction was in error, but because we adopt the rule of mutually dependent covenants for commercial leases and conclude that the plaintiff landlord breached his covenant to maintain the roof, the tenant was entitled to terminate the lease and recover relocation costs.

2. *Standard of review.* In a jury-waived trial, the judge's findings of fact are accepted unless they are clearly erroneous. See *Kendall* v. *Selvaggio*, 413 Mass. 619, 620 (1992), and cases cited. "On the other hand, to ensure that the ultimate findings and conclusions are consistent with the law, we scrutinize without deference the legal standard which the judge applied to

---

[13]The tenant calculated that he spent over $14,000 in moving expenses, but the judge found that "Leone did not sustain his burden of proof in proving much of the damage by a preponderance of the evidence" and awarded only $1,063 for "moving machinery" and "relocating the telephone system."

the facts. . . . Thus, the 'clearly erroneous' standard of appellate review does not protect findings of fact or conclusions based on incorrect legal standards." (Citations omitted.) *Id.* at 621.

3. *Constructive eviction.* The landlord bases his claim that the judge erred in finding a constructive eviction on two alternative grounds: first, that the lease required the tenant, not the landlord, to maintain the roof and therefore the tenant cannot claim constructive eviction due to the landlord's failure to make repairs, see *Stone* v. *Sullivan*, 300 Mass. 450, 454-455 (1938)[14]; and second, that even if the lease required the landlord to maintain the roof, his actions or failures did not rise to the level of constructive eviction.

The landlord's contention that the terms of the lease make the tenant responsible for maintaining the roof is an argument made first on appeal and is therefore waived. In any event, the judge's implicit finding that it was the landlord's obligation under the lease to keep the roof in good repair is fully supported by the evidence, including the landlord's testimony at trial that "it was [his] obligation under this lease to maintain the roof . . . in perfect working order."

We next consider whether the landlord's actions regarding the leaky roof constituted a breach of the covenant of quiet enjoyment amounting to the constructive eviction of the tenant. Where there is a breach of the covenant of quiet enjoyment, the tenant may raise constructive eviction as a defense to an action to recover rent. See *Shindler* v. *Milden*, 282 Mass. 32, 33-34 (1933). A constructive eviction is any "act of a permanent character, done by the landlord, or by his procurement, with the intention and effect of depriving the tenant of the enjoyment of the premises demised, or of a part thereof, to which he yields and abandons possession," *id.* at 33, and cases cited, "within a reasonable time." *Stone* v. *Sullivan, supra* at 455 It is the tenant's burden to prove that he was constructively evicted. *Rome* v. *Johnson*, 274 Mass. 444, 450 (1931).

---

[14]"In the absence of express agreement by a lessor to make repairs on leased premises not in his control, a failure to do so does not give the lessee the right to quit or to refuse to pay the rent, even though for lack of repair the leased premises became . . . unfit for the use for which they were leased." *Stone* v. *Sullivan*, 300 Mass. 450, 454 (1938).

In ascertaining whether there has been a constructive eviction, it is "the landlord's conduct," and not his subjective intention, that "is controlling." *Blackett* v. *Olanoff*, 371 Mass. 714, 716 (1977). Therefore, a constructive eviction may be found even where a landlord did not intend to violate a tenant's rights, as the law assumes that the landlord intends "the natural and probable consequence of what [he] did, what he failed to do, or what he permitted to be done." *Id.* However, not every act or failure to act on the part of the landlord that causes disruption to a tenant rises to the level of a constructive eviction. To constitute a constructive eviction, the act must have "some degree of substance and permanence of character." *Tracy* v. *Long*, 295 Mass. 201, 204 (1936). Thus, a landlord's failure to provide a service that is essential to the use and enjoyment of the demised premises may qualify as a constructive eviction.[15] Yet, conduct that does "not make the premises untenantable for the purposes for which they were used" will not constitute constructive eviction. *A.W. Banister Co.* v. *P.J.W. Moodie Lumber Corp.*, 286 Mass. 424, 426 (1934) (landlord's breach of express covenant to supply steam to dry lumber "simply made the use [of the leased premises] less convenient and more expensive" and "[d]amages for breach of covenant . . . afforded an adequate remedy").[16]

In this case, the judge found that the landlord failed to

[15] See *Charles E. Burt, Inc.* v. *Seven Grand Corp.*, 340 Mass. 124, 126-128 (1959) (landlord's failure to provide essential services, including electric power, heat, and elevator services, for six-month period found to be constructive eviction of commercial tenant); *Shindler* v. *Milden*, 282 Mass. 32, 33-34 (1933) (constructive eviction where landlord failed to provide promised heating system and leased premises rendered unfit for intended use as restaurant); *Rome* v. *Johnson*, 274 Mass. 444, 448 (1931) (manufacturer constructively evicted by landlord's failure to provide sufficient heat over four-month period resulting in such extreme cold that "oil used in the machines slowed up their operation" and "at times . . . the [employees] had to stand around and could not do their work"); *Boston Veterinary Hosp.* v. *Kiley*, 219 Mass. 533, 537 (1914) (shutting off tenant's water rendered leased stables "unsuitable for the purposes for which they were hired"); *Brown* v. *Holyoke Water Power Co.*, 152 Mass. 463, 464 (1890) (landlord constructively evicted tenant manufacturer by permanently disconnecting all power to machinery).

[16] See *Sims* v. *Mason*, 361 Mass. 881, 881 (1972) (lessors' failure to make promised improvements, to provide proper cleaning services, and to furnish suitable heat and air conditioning "not . . . sufficient to amount to a constructive eviction" of leased office space); *Capp* v. *Chamberlain Real Estate, Inc.*,

adequately maintain the roof, and that, as a consequence, there were periodic leaks during the course of the tenancy. While this finding was supported by the evidence, it is not dispositive of the constructive eviction claim. The tenant was also required to prove that the leaks made "the premises untenantable for the purposes for which they were used." *Id.* On this point, the tenant's evidence was inadequate as a matter of law.

The evidence of untenantability at trial consisted of testimony that (1) there were leaks "right on top" of one of the "high-tech," expensive cameras and that after "the camera got wet" it was covered with plastic sheeting so it would not get wet again; (2) a customer's preprinted paper stock was protected with plastic sheeting after a leak had "dampened the top portion" of his "skids of paper"; and (3) at times "the ceiling tiles got so wet that they . . . crumbled and fell out." There was no evidence that the leaks caused work stoppages, resulted in missed or delayed customer deliveries, or otherwise prevented the tenant from carrying on business.[17] The tenant continued to conduct business from the time it first complained of the leaks in April, 1991, through the time the tenant moved out sometime after November 4, 1991. While the landlord's breach of his covenant to repair may have made the tenant's operation less convenient and more expensive, based on the evidence adduced at trial, it did not rise to the level of a constructive eviction.

4. *Application of the dependent covenants rule.* At common law, covenants in leases were considered "independent, in the absence of clear indications to the contrary, and the lessee [was] relieved from performance of his covenants only by actual or constructive eviction." *Barry* v. *Frankini*, 287 Mass. 196, 201 (1934). See Restatement (Second) of Property (Landlord and Tenant) Introductory Note to c. 7 (1977) ("At old common law

---

355 Mass. 58, 60-61 (1968) (no constructive eviction from apartment leased for commercial use as studio where wiring adequate for normal use but inadequate to run air conditioners installed by lessee); *Gateway Co.* v. *Charlotte Theatres, Inc.*, 297 F.2d 483, 484 & n.2 (1st Cir. 1961) (applying Massachusetts law and expressing "considerable doubt" as to whether "delay in failure to install the air conditioning could ever be regarded as a constructive eviction" that requires breach "of a fundamental nature, not just something that costs some money").

[17]See and compare cases cited in notes 15 and 16, *supra.*

the promises made by a landlord in a lease were independent obligations, so that the failure of the landlord to perform them did not give the tenant any right to disregard his obligations under the lease"). The independent covenants rule applied to both residential and commercial leases and was based on the assumption that "a lease is primarily a conveyance of an interest in real estate," *Boston Hous. Auth.* v. *Hemingway*, 363 Mass. 184, 194 (1973), and "reflected the parties' expectations in a rural agrarian society where the right to possession of the land constituted the chief element of the exchange." *Id.* at 189. "The theory of a lease as a conveyance . . . fitted in well with the ancient farm lease. The lease was essentially of land; the house was incidental. Tenant got no services from landlord and expected none. Tenant was there, landlord absent. Tenant had tools that he was well versed in using. He could make such repairs as might be necessary." 1 M.R. Friedman, Leases § 1.1 at 5-6 (4th ed. 1997). As a result, "[e]ven if the landlord made express maintenance promises in the lease, courts often held that the landlord's breach of these 'secondary' obligations did not affect the tenant's obligation to pay rent." *Boston Hous. Auth.* v. *Hemingway*, *supra*. This apparent unfairness was balanced under the same doctrine by the inability of the landlord to recover possession of his property from a tenant even if the tenant breached its covenant to pay rent. Both lessor and lessee were limited in their remedies to seeking damages for breach of the lease covenants. See Note, Modernizing Commercial Lease Law: The Case for an Implied Warranty of Fitness, 19 Suffolk U.L. Rev. 929, 934 (1985). Any equilibrium that may have existed in this application of the rule was lost with the enactment of statutory dispossession actions, permitting landlords to regain possession of the premises if the tenant failed to pay rent even though the landlord may have breached express covenants within the lease. See, e.g., G. L. c. 186, § 11 (landlord entitled to recover possession on neglect or refusal to pay rent due under written lease).[18]

Exceptions to the independent covenants rule first emerged in

---

[18]Some commentators have suggested that there was always disequilibrium in the landlord-tenant relationship fostered by the independent covenants doctrine. Quinn, The Law of Landlord-Tenant: A Critical Evaluation of the

the context of residential leases at the end of the Nineteenth Century. In 1892, this court held that the rule did not apply to the lease of "a furnished room or a furnished house for a few days or a few weeks or months." *Ingalls* v. *Hobbs*, 156 Mass. 348, 350 (1892). The rationale for this exception "rested on the broader premise that we would not apply the independent covenants rule in those cases where the essential purpose of the lease was not the transfer of an interest in land but the use of the demised premises for immediate occupation." *Boston Hous. Auth.* v. *Hemingway, supra* at 191. As it applied to residential leases, the independent covenants rule was completely supplanted in 1973, when we recognized that a residential "lease is essentially a contract between the landlord and the tenant wherein the landlord promises to deliver and maintain the demised premises in habitable condition and the tenant promises to pay rent for such habitable premises." *Id.* at 198. "These promises constitute interdependent and mutual considerations." *Id.*

That decision was consistent with the national trend in residential leases away from interpretations based on classic property law doctrine that treated leases as "conveyances," and toward modern notions of leases as contracts for the possession of property, and modern notions of consumer protection. In these respects, it was based on the landmark case of *Javins* v. *First Nat'l Realty Corp.*, 428 F.2d 1071, 1078-1079 (D.C. Cir.), cert. denied, 400 U.S. 925 (1970), which noted a number of reasons for departing from the common-law rule in residential leases, including (1) the tenant's shift in interest from the land itself to the buildings on the land; (2) the tenant's inability to make repairs himself, unlike "the 'jack-of-all-trades' farmer who was the common law's model of the lessee"; (3) the lack of incentive for the tenant to make repairs, given the relatively short duration of the lease; (4) the difficulty in repairing complex buildings and the need to access areas under the landlord's control; and (5) the tenant's inability to obtain financing for major repairs because "they have no long-term interest in the

Past with Guidelines for the Future, 38 Fordham L. Rev. 225, 230 (1969). See Note, Modernizing Commercial Lease Law: The Case for an Implied Warranty of Fitness, 19 Suffolk U.L. Rev. 932-934 (1985).

property." This trend culminated in the almost universally recognized warranty of habitability implied in residential leases. See Vlatas, An Economic Analysis of Implied Warranties of Fitness in Commercial Leases, 94 Colum. L. Rev. 658, 658-659 (1994); Bopp, The Unwarranted Implication of a Warranty of Fitness in Commercial Leases — An Alternative Approach, 41 Vand. L. Rev. 1057, 1057 (1988); Note, Modernizing Commercial Lease Law: The Case for an Implied Warranty of Fitness, *supra* at 930-931.

The development of the law of commercial leases has followed divergent paths. See Bopp, *supra* at 1069-1080; Note, Modernizing Commercial Lease Law: The Case for an Implied Warranty of Fitness, *supra* at 945-949. Some courts interpret commercial leases as they would any other commercial contract[19]; while others have taken a step in that direction by abolishing the independent covenants rule in favor of a rule of mutually dependent covenants.[20] Still other courts have acted at the extremes, either by continuing strictly to apply the independent

---

[19]See *Medico-Dental Bldg. Co. of Los Angeles* v. *Horton & Converse*, 21 Cal. 2d 411, 418-419 (1942) (applying law of contracts and intention of parties to decide whether commercial lease provisions were dependent or independent on case-by-case basis); *GTM Invs.* v. *Depot, Inc.*, 694 P.2d 379, 381 (Colo. Ct. App. 1984) (relying on *Shanahan* v. *Collins*, 189 Colo. 169, 171 [1975], and applying principles of contract law to construe covenants of a commercial lease as independent); *56-70 58th St. Holding Corp.* v. *Fedders-Quigan Corp.*, 5 N.Y.2d 557, 561-562 (1959) (whether covenants are dependent or independent to be determined by intention and meaning of parties as expressed in contract and application of common sense); *Esmieu* v. *Hsieh*, 20 Wash. App. 455, 460 (1978) (in commercial lease court looks to contract as a whole to discover intent of parties).

[20]See *Terry* v. *Gaslight Square Assocs.*, 182 Ariz. 365, 370 (Ct. App. 1994) (adopting dependence of covenants rule set forth in Restatement [Second] of Property [Landlord and Tenant] § 7.1 [1977] and permitting commercial tenant to terminate lease on landlord's breach); *Teodori* v. *Werner*, 490 Pa. 58, 65 (1980) (applying dependence of obligations approach of § 7.1 and holding that tenant's obligation to pay rent was not independent of landlord's obligation under noncompetition clause); *Richard Barton Enters., Inc.* v. *Tsern*, 928 P.2d 368, 378 (Utah 1996) (applying § 7.1 and holding that lessee's covenant to pay rent dependent on lessor's performance of covenant to repair). Cf. *Matter of Ogden Howard Furniture Co.*, 35 B.R. 209, 210 (Bankr. D. Del. 1983) ("covenants of parties to lease agreements are mutual and dependent"); *Business Bank* v. *F.W. Woolworth Co.*, 244 Va. 333, 335-336 (1992) (tenant not entitled to recover damages for landlord's alleged breach without first complying with notice provision of § 7.1).

covenants rule,[21] or by moving to the other end of the spectrum and recognizing an implied warranty of suitability in commercial leases.[22] While we conclude that there is a need to move away from the rule of independent covenants, we continue to recognize that there are significant differences between commercial and residential tenancies and the policy considerations appropriate to each.[23]

The landlord claims that the judge erred by applying the dependent covenants rule to the parties' lease and concluding that the landlord's failure "to provide an essential service, a dry space" would have permitted the tenant "lawfully [to withhold] rent had he not vacated the Wesson building." He contends that this court has not supplanted the independent covenants rule in Massachusetts, and therefore a commercial landlord's breach of the covenant to repair does not relieve the tenant of his covenant to pay rent. See *Stone* v. *Sullivan*, 300 Mass. 450, 454 (1938); *In re J.A.G., Inc.*, 7 B.R. 624, 627 (Bankr. D. Mass. 1980).[24] As

[21]See Greenwich Plaza, Inc. *vs.* Whitman & Ransom, Conn. Superior Court No. CV 95054081 (Mar. 19, 1996) (rejecting invitation to abandon Connecticut common law of independent covenants); *McArdle* v. *Courson*, 82 Ill. App. 3d 123, 126 (1980) (covenants of lessor and lessee independent unless terms of lease provide otherwise); *Block Props. Co.* v. *American Nat'l Ins. Co.*, 998 S.W.2d 168, 176 (Mo. Ct. App. 1999) ("covenants in a lease are mutually independent unless expressly made dependent by a clause in the lease. . . . If no such clause is included in the lease, a breach . . . by either party neither terminates the lease nor excuses the performance of the innocent party"); *South Forks Shopping Ctr., Inc.* v. *Dastmalchi*, 446 N.W.2d 440, 444 (N.D. 1989) (covenant to lease additional space analogous to covenant to repair, and independent of rent due for lease of present space).

[22]See *Reste Realty Corp.* v. *Cooper*, 53 N.J. 444, 460-461 (1969) (recognizing implied warranty against latent defects in commercial leases); *Davidow* v. *Inwood N. Professional Group-Phase I*, 747 S.W.2d 373, 377 (Tex. 1988) (commercial tenant justified in discontinuing rent payments where landlord breached implied warranty of suitability because "no valid reason to imply a warranty of habitability in residential leases and not in commercial leases").

[23]See Note, Dependent Covenants and Commercial Leases after Barton v. Tsern: Rhetoric of Reform Claims an Easy Victory in Utah, 1997 Utah L. Rev. 807, 823-827, 829-831 (1997); Bopp, *supra* at 1081-1087.

[24]In applying the dependent covenants rule to the lease, the judge relied on another Superior Court decision declining to apply the independent covenants rule to a commercial lease, because of questions about the vitality of the rule in Massachusetts, and on *Holmes Realty Trust* v. *Granite City Storage Co.*, 25 Mass. App. Ct. 272, 277 (1988) ("There is great doubt whether [the

noted previously, the premise underlying the continued viability of the independent covenants rule is that a commercial lease is a conveyance of property where the right to possession of the land constitutes the chief element of the exchange. This premise no longer comports with the reality of the typical modern commercial lease, which is intended to secure the right to occupy improvements to the land rather than the land itself, and which usually contemplates a continuing flow of necessary services from landlord to tenant, services that are normally under the landlord's control. See 1 M.R. Friedman, Leases § 1.1 (4th ed. 1997).

We conclude that the better rule is the rule of mutually dependent covenants set forth in the Restatement (Second) of Property (Landlord and Tenant) § 7.1 (1977), the principles of which we adopt to the extent necessary to resolve the issues in this case. Specifically, we adopt so much of the Restatement that provides as follows:

> "Except to the extent the parties to a lease validly agree otherwise, if the landlord fails to perform a valid promise contained in the lease to do, or to refrain from doing, something . . . and as a consequence thereof, the tenant is deprived of a significant inducement to the making of the lease, and if the landlord does not perform his promise within a reasonable period of time after being requested to do so, the tenant may (1) terminate the lease . . . ." *Id.* at 247.

"The rule of this section . . . is based on a logical extension of the position taken by a significant number of judicial decisions which have applied the [dependence of obligations] doctrine in connection with the failure of the landlord to fulfill his obligations in regard to the condition of the leased property." Restatement (Second) of Property (Landlord and Tenant), *supra* at § 7.1 Reporter's Note at 252. It also reflects our view of the

---

independent covenant] formulation remains a correct statement of Massachusetts law"). See *Reed* v. *United States Postal Serv.*, 660 F. Supp. 178, 182-183 (D. Mass. 1987) (applying Massachusetts law entitling tenant to withhold rent if landlord breached duty to repair).

better reasoned path to follow in modernizing the law of commercial leases.[25]

Having adopted a rule of mutually dependent covenants, we now consider whether the tenant was entitled to vacate the premises prior to the lease termination date in light of our earlier conclusion that no constructive eviction occurred.[26]

The requirements of the rule we have adopted today are different from the requirements necessary to demonstrate a constructive eviction. For example, the rule does not require that the premises be "untenantable for the purposes for which they were used," in order for the tenant to terminate the lease and vacate the premises. It is sufficient for the tenant to demonstrate the landlord's failure, after notice, to perform a

---

[25]We decline to reach the issue whether an implied warranty of suitability, similar to the implied warranty of habitability for residential leases, should be adopted for commercial leases. See *Boston Hous. Auth.* v. *Hemingway*, 363 Mass. 184, 199 (1973) ("in a rental of any premises for dwelling purposes, under a written or oral lease, for a specified time or at will, there is an implied warranty that the premises are fit for human occupation"). Adopting such a warranty is not necessary to the adoption of a dependent covenants rule and, as noted, raises a different set of policy issues and considerations in the commercial context. See *Chausse* v. *Coz*, 405 Mass. 264, 268 (1989) (declining to rule on implied warranty of habitability for commercial premises).

[26]Ordinarily, judicial changes to contract and property law are applied prospectively only, "[p]rimarily because of concern for litigants and others who have relied on existing precedents." *Payton* v. *Abbott Labs*, 386 Mass. 540, 565 (1982). See *Johnson Controls, Inc.* v. *Bowes*, 381 Mass. 278, 282-283 (1980) (insurance contracts); *Whitinsville Plaza, Inc.* v. *Kotseas*, 378 Mass. 85, 97-98 (1979) (covenants not to compete in deeds and leases). Such concerns are compelling where "the change of existing laws involves a previously unquestioned aspect of . . . law, in which reliance interests exert a strong influence." *Johnson Controls, Inc.* v. *Bowes*, *supra* at 283 n.4. These are not the circumstances of the rule we adopt in this case. The abandonment of the rule of independent covenants in commercial leases has been foreshadowed at least since our 1973 decision in *Boston Hous. Auth.* v. *Hemingway*, *supra*, in which we abandoned the rule in residential leases. In the interim, the Restatement (Second) of Property (Landlord and Tenant) (1977) adopted the rule of dependent covenants, and the lack of continued vitality in Massachusetts of the rule of independent covenants has been foreshadowed in cases decided by the Appeals Court, *Holmes Realty Trust* v. *Granite City Storage Co.*, *supra*, and by the Federal court, *Reed* v. *United States Postal Serv.*, *supra*. In these circumstances, commercial landlords and tenants have had ample warning and opportunity to anticipate such a change and to incorporate appropriate provisions in their lease agreements. The concern for reliance on unquestioned precedent is simply not present here. Consequently, we apply the rule to the lease in this case.

promise that was a significant inducement to the tenant's entering the lease in the first instance. We interpret this language to include promises that constitute a substantial benefit understood at the time the lease was entered to be significant to the purpose thereof. *Richard Barton Enters., Inc.* v. *Tsern*, 923 P.2d 368, 378 (Utah 1996) (covenant to pay rent dependent on lessor's performance of covenants that were significant inducement to enter lease or significant to "the purpose for which the lessee entered into the lease"). Here that substantial benefit was a dry space necessary to safely conduct the high technology printing business for which the landlord knew the premises were to be used. In other cases, it might include promises having little to do with the condition of the premises, such as an agreement not to lease space in the same building to competing businesses. See *Teodori* v. *Werner*, 490 Pa. 58, 65 (1980) (landlord's non-competition promise critical to commercial lease agreement).

Based on the judge's findings of fact, all of the requirements of the rule have been met in this case: the landlord breached his covenant to maintain the roof by failing to adequately repair its chronic leaking; the breach directly interfered with the tenant's business by depriving it of a substantial benefit significant to the purpose of the lease; and, after adequate notice, the landlord's efforts to correct the problem were both "shoddy and unsuccessful." The tenant was entitled to terminate the lease and recover relocation costs in the amount determined by the judge.

5. *Conclusion.*

For the reasons stated above, we affirm the judgment and award of damages to the tenant defendant.

*So ordered.*