Fremont-Smith, Thayer, J.
This case was tried jury-waived on October 15-17, 2007. Based on all of the credible evidence, the Court makes the following rulings and findings.
Early in 2000, the plaintiff entered into a lease with the defendant, J.C. Cannistraro, Inc. (“Cannistraro”) for approximately 9,200 square feet of manufacturing space located in the lower level of 213 California Street, Newton, Massachusetts (hereinafter, the “Premises”).
Thereafter, at Cannistraro’s request, plaintiff agreed to release Cannistraro from its lease and to substitute Bill Golden (“Golden”) and Joseph Troy (“Troy”), d/b/a Charles River Movers (“CRM”), as the tenants at the Premises, for a monthly rental of about $3,300 commencing on May 15, 2000.
Under ¶11 of the CRM Lease, “the Lessor agree[d] to maintain the structure of the building of which the leased premises are a part, in the same condition as it is at the commencement of the term or as it may be put in during the term of this lease . . .”
Under ¶21 of the CRM lease, Lessor agreed to “repair all broken windows at the leased premises and shall mark the high water table area of the Premises so that Lessee may elevate its property on palettes to prevent water damage.”
As plaintiff lacked confidence in the creditworthiness of CRM, he required, before agreeing to the substituted tenancy, that Cannistraro guarantee fifty percent of any defaults by CRM in payment of rent and of other items for which CRM was made responsible under its lease. [1]
The term of the guarantee extended to the expiration of the lease (February 28, 2003) and provided that Lessor would notify defendant in writing within 30 days of default of any payment for which plaintiff would seek reimbursement from the defendant.
CRM made the required rental and other payments under the lease[2] until July 2001, but then, without prior notice to plaintiff, vacated the premises on or about July 31, 2001 and made no further payments. As the parties have stipulated that the primary obli-gors under the lease (Golden, Troy, and CRM) cannot be reached for payment of any of their lease obligations, the guarantor, Cannistraro, is the proper defendant before the Court.
Defendants took the position at trial that the guarantee could not be enforced because plaintiff failed to provide the required 30-day default notices. It contended that the first default notice it received, dated February 20, 2001, referenced rent and expenses due through July 2001, which were then paid. It contends that the next default notice it received was not until November 2002, by which time the amount due had *248 risen to over $107,000, and that, had plaintiff been provided with the requisite monthly notices, it could have taken over the lease in order to find a sub-tenant, or have brought action against CRM, which was at that time solvent.
The Court, however, does not credit the testimony of defendant’s witnesses in that regard. Defendant’s in-house counsel, who from the beginning has handled matters pertaining to the lease and the guarantee, testified that, on February 21, 2001, after receipt of the February 20, 2001 default notice, she met with Troy and Golden about their failure to pay rent, and, at that meeting, accepted their explanation that they had failed to pay rent because of flooding and lack of heat at the Premises which amounted to a constructive eviction which justified CRM’s non-payment of rent. She further testified that they told her that Peter Zagorianakos had told them in June during a walk-through that if they paid the then-due rent and promptly vacated the Premises, plaintiff would consider the lease to be terminated without any further obligation on their part.
Whether or not defendant’s testimony as to CRM’s stated justification for its tardy rent payments and as to CRM’s purported receipt of permission to terminate the lease is believed,[3] according to defendant’s own admission defendant had knowledge, at least by June 2001, of CRM’s intended abandonment of the Premises and its intended non-payment of rent, but did nothing to protect itself.[4]
In view of the lack of credibility of this and some of plaintiffs attorney’s other testimony, the Court is not persuaded by her testimony that defendant did not receive an additional default letter dated August 27, 2001, after which, in the circumstances,[5] any further periodic default letters regarding CRM’s failure to pay each month’s rent, would have been “a useless gesture.” See Shawmut-Canton LLC v. Great Spring Waters of America, Inc., 62 Mass.App.Ct. 330, 340 (2004), and cases there cited (holding that, while a default notice requirement in a guarantee is generally to be strictly enforced, it is not required in circumstances where it would be a futile or “useless gesture”).
As the Court concludes that plaintiff is not barred from recovery for failure to provide defendant with default notices after August 27, 2001, the Court must determine whether defendant has sustained its burden to prove that CRM was constructively evicted from the Premises or whether plaintiff breached any covenant in the lease so as to have justified CRM’s default on its lease obligations.
In response to plaintiffs November 11,2002 default letter, Cannistraro responded with a letter stating that it did not believe that it had any obligation to pay money to the Landlord pursuant to its guaranty because CRM had been constructively evicted.
Wesson v. Leone Enterprises, Inc., 437 Mass. 708 (2002), involved a situation where the tenant, as here, alleged it had been constructively evicted from the premises by the landlord’s failure to prevent rainwater from entering and his failure to provide heat. In holding that there had not been a constructive eviction, the Court observed, at 714:
not eveiy act or failure to act on the part of the landlord that causes disruption to a tenant rises to the level of a constructive eviction. To constitute a constructive eviction, the act must “have some degree of substance and permanence of character.” Tracy v. Long, 295 Mass. 201, 204, 3 N.E.2d 789 (1936). Thus, a landlord’s failure to provide a service that is essential to the use and enjoyment of the demised premises may qualify as a constructive eviction. Yet, conduct that does “not make the premises untenantable for the purposes for which they were used” will not constitute constructive eviction. A. W. Banister Co. v. P.J.W. Moodie Lumber Corp., 286 Mass. 424, 426 (1934).
The Supreme Judicial Court went on to find that evidence the tenants’ equipment got wet and had to be covered with plastic sheeting and that wet ceiling tiles had fallen out, was insufficient to constitute constructive eviction where there was “no evidence that the leaks caused work stoppages, resulted in missed or delayed customer deliveries, or otherwise prevented the tenant from carrying on business. The tenant continued to conduct business from the time it first complained of the leaks in April 1991, through the time the tenant moved out some time after November 4, 1991.” Id., at 715.[6]
Similarly, in this case, while there was evidence that a considerable amount of water flooded under the over-head doors and came from leaking windows and pipes, which caused damage to some of the stored furniture, and that this, together with heating failures, caused discomfort and additional expense to the tenants, there was no evidence that these conditions were so severe as to cause any work stoppages, resulted in missed or delayed customer deliveries, or otherwise prevented the tenant from carrying on business. On the facts of the case at bar, which are quite similar to those presented in Wesson, the Court rules that the tenant was not constructively evicted.
The Court in Wesson further held that even if there was not a constructive eviction, a tenant can be justified in terminating a lease as a result of the landlord’s breach of a “mutually dependent covenant” in the lease. The Court quoted with approval the Restatement (Second) of Properly (Land and Tenant) §7.1 (1997) and held: “if the landlord fails to perform a valid promise contained in the lease to do, or to refrain from doing something,” which deprives the tenant of a “significant inducement to the making of the lease,” this may justify the tenant’s lease termination. Id. at 720 (emphasis supplied). However, the Court expressly declined to reach the issue “whether an implied warranty of suitability similar to an implied *249 warranty of habitability for residential leases should be adopted in commercial leases.” Id., at 721, n.25.
Here, an earlier “summaiy of proposed agreements” had provided that the plaintiff will be responsible for taking necessary action “if the area [of flooding] turns out to be greater than anticipated.” Defendant’s lawyer’s testimony that this conformed to the lease language as was actually adopted, however, was plainly erroneous. The lease provides only that the lessor will “mark the high water table area of the Premises[7] so that LESSEE may elevate its property on palettes to prevent water damage.” The plaintiff made no covenant in the lease or otherwise to do anything else with regard to the flooding which everyone knew from the beginning did occasionally occur.
The only other promise by the landlord in the lease in regard to maintenance was that it would “maintain the structure of the building of which the leased premises are a part, in the same condition as it is at the commencement of the term or as it may be put in during the term of this lease.” There was no evidence of any breach of this promise by the landlord.
With respect to any promise by the landlord to provide heat in the Premises, in spite of admitted periodic heating problems, there generally was heat in the premises, and complaints by CRM in this regard were responded to, usually in a reasonably prompt manner.
Accordingly, the Court finds that the defendant has failed to prove a breach of a mutually dependent covenant and plaintiff is entitled to recover under the guarantee what is owed by CRM.
DAMAGES
The total amount of CRM’s defaulted obligations under its lease, which include unpaid rent, CRM’s share of the real estate taxes and water and sewer costs, and interest, is $101,369.00. Under its guaranty, Cannistraro is liable to the landlord for 50% of this amount, which is $50,684.50.[8]
Defendant asserts that it is entitled to deduct, as a “setoff,” about $10,000 from the amount owed to the landlord, being the damages which CRM allegedly incurred as a result of the flooding. However, no affirmative defense of “setoff’ was set forth in defendant’s answer to the complaint, so that any such claim has been waived. As noted above, moreover, defendant has failed to prove that such damages resulted from any violation of any covenant of plaintiff contained in the lease.
ORDER FOR JUDGMENT
Accordingly, judgment shall enter for the plaintiff against the defendant in the sum of $50,684.50 plus interest and costs.
Defendant’s cross claim against Bill Golden and Joseph Troy, d/b/a Charles River Movers has been waived, and is accordingly dismissed.

Real estate tax, water, sewer and utility payment obligations. The parties stipulated that heating expense was not included in “utilities."

Those payments were frequently late.

Incredibly, she testified that, although she was acting as the guarantor's attorney with respect to the lease and the guarantee, she did not, upon being notified of CRM’s intention to abandon the lease, even bother to confirm with plaintiff that he had agreed to this. She further testified that, at the February meeting with Golden and Troy, there was no discussion of CRM’s cash-flow problems being a cause of their late rent payments, even though, two days later, Golden wrote plaintiff apologizing for the tardiness, explaining that “our business is seasonal,” and assuring plaintiff they would “be on track” by April 11.

Canistraro’s letter to Peter Zagorianakos dated November 13, 2002 also confirms the defendant’s understanding that the “lease terminated in July of 2001."

By August 2001, the tenants had vacated the Premises and Pete Zagorianakos had been informed by defendant’s attorney that CRM and the defendant considered the lease to have been abrogated by plaintiffs constructive eviction of CRM.

As for the tenantability of the Premises, in this case there was a tenant there both before and after the tenancy of CRM. Here, moreover, defendant’s photographic evidence of water which had flooded under the over-head doors was limited to two occasions in 2000 when there had been an unusually heavy rainfall so as to cause the town’s storm drains to back up and overflow. It is also noteworthy that, while the worst flooding occurred in March and June of 2000, CRM did not move out until July 31, 2001.

In light of the conflicting testimony, the Court is not persuaded that plaintiff failed to “mark the high water table of the Premises” to the best of his knowledge and belief. In any event, the tenants did elevate their property on palettes, though the palettes proved to be not high enough to prevent water damage from the worst flooding.

There were slight variances in the testimony with regard to computation of the exact amount owed, but the parties did not dispute that approximately $50,000 remained unpaid according to the lease.