**TALLACKSON POTATO COMPANY, INC., Plaintiff and Appellee,**

v.

**MTK POTATO COMPANY and Allan C. Thompson, Defendants and Appellants.**

Civ. No. 9512.

Supreme Court of North Dakota.

April 30, 1979.

F. W. Greenagel, of Dahl & Greenagel, Grafton, for plaintiff and appellee.

John H. Moosbrugger, of Mack, Moosbrugger, Ohlsen & Dvorak, Grand Forks, for defendants and appellants.

VANDE WALLE, Justice.

Tallackson Potato Company, Inc. ("Tallackson"), brought an action for breach of contract against MTK Potato Company and Allan C. Thompson (both referred to as "MTK"). MTK appeals from the district court's judgment, rendered after a trial to the court, against it and in favor of Tallackson. We affirm.

MTK, a partnership with three members (one of whom was Allan C. Thompson), and Tallackson, a corporation, were members of the International Co-op ("Co-op"), a cooperative association formed to buy and process the potatoes of member growers. By individual contract, each member of the Co-op, including the parties to this appeal, agreed to deliver a certain amount of potatoes to the Co-op over a specified period of months.

In November, 1976, Thomas Tallackson, a stockholder of Tallackson Potato Company, Inc., contacted an official of the Co-op and told him that if any Co-op member lacked sufficient potatoes with which to satisfy the amount due from it under the Co-op agreement, that member could purchase potatoes from Tallackson. Shortly thereafter, MTK (through Allan C. Thompson), which was in need of potatoes to fulfill its contractual requirement with the Co-op, and Tallackson

discussed by telephone the possibility of a sale of potatoes by Tallackson to MTK. In the course of the conversation, the parties agreed that Tallackson would sell to MTK 6,000 hundredweight of Kennebec potatoes for $2.60 per hundredweight. Tallackson also agreed to deliver the potatoes to the Co-op for 30 cents per hundredweight as transportation and handling costs. To confirm the agreement for the purchase of the potatoes, MTK, through Allan Thompson, sent Tallackson a mailgram that stated:

"MTK POTATO CO OF WALHALLA ND AGREES TO BUY FROM TOM TALLACKSON OF GRAFTON ND AP-PROXIMATELY 6000 HUNDRED WEIGHT OF KENNEBEC POTATOES TO B[E] DELIVERED TO THE INTER-NATIONAL CO-OP IN GRAND FORKS ND STARTING APPROXIMATELY DECEMBER 1. PURCHASE PRICE OF SAID POTATOES IS TO BE $2.60 PER HUNDRED WEIGHT PLUS FREIGHT ALLOWANCE BY INTERNATIONAL CO-OP FROM WALHALLA TO GRAND FORK [sic] MTK IS TO PAY TALLACKSON AS THEY RECEIVE THEIR MONIES FROM THE INTER-NATIONAL CO-OP." [1]

Tallackson received the mailgram and did not object to any of its provisions.

Tallackson delivered the specified amount of potatoes to the Co-op in accordance with the contract between it and MTK. MTK, in turn, made payments for the potatoes totaling $8,532.15 by endorsing to Tallackson checks issued to it by the Co-op pursuant to the agreement between the Co-op and MTK.[2]

Early in 1977, the Co-op informed its members that it no longer would make payments according to the payment schedule contained in the agreements between it and the member growers, and, instead, would defer these payments until a later unspecified time. At that point, MTK refrained from making further payments to Tallackson for the potatoes that it purchased from Tallackson.

It is clear that Tallackson and MTK agreed that MTK would buy, and Tallackson would sell, a specified amount of potatoes. It is also clear that the parties discussed during their contractual negotiations the manner in which MTK would pay Tallackson for the potatoes that it purchased. It is not so clear, however—and this issue is the crux of this appeal—what the parties agreed to about the manner of payment for the potatoes. Tallackson argues that the parties agreed that MTK was to pay for the potatoes in accordance with the payment schedule set forth in the agreements between the Co-op and its member growers.[3]

1. The district court concluded, and MTK appears to concede, that the mailgram was not the contract, but was, instead, only an acceptance or confirmation of the contract.

2. MTK paid to Tallackson $3,776.33 on December 21, 1976, $3,603.36 on January 14, 1977, and $1,152.46 on January 14, 1977.

3. The agreements between the Co-op and its members provided that settlement for the potatoes delivered by members would be made according to the following schedule:
  "a. The first payment to be paid 15 days after delivery by the Seller to the Buyer at the Buyer's plant shall not exceed 50% of the lesser of either.
  "1. The competitive price per hundred weight of potatoes, or
  "2. The estimated Seller proceeds per hundred weight of potatoes.
  "b. The second payment to be paid 120 days after delivery by the Seller to the Buyer's plant shall bring the total of the first and

second payments to an amount not to exceed 70% of the lesser of either:
  "1. The competitive price per hundred weight of potatoes, or
  "2. The estimated seller proceeds per hundred weight of potatoes.
  "c. The third payment to be paid 180 days after delivery by the Seller to the Buyer at the Buyer's plant shall bring the total of the first, second and third payments to an amount not to exceed 80% of the lesser of either:
  "1. The competitive price per hundred weight of potatoes, or
  "2. The estimated Seller proceeds per hundred weight of potatoes.
  "d. The final payment to be made no later than 8½ months after completion of the fiscal year and shall be determined as of the end of the Association's fiscal year, and shall bring the total of the payments to an amount equal to the lesser of either:
  "1. The competitive price per hundred weight of potatoes, or

Hence, Tallackson argues, the Co-op's failure to make payments to MTK in no way relieved MTK of its obligation to pay Tallackson for the potatoes that it purchased from Tallackson. Contrary to this, MTK argues that the agreement between it and Tallackson obligated it to pay for the potatoes only when it received payment for them from the Co-op. It contends that because it has not received payment from the Co-op it is not yet obligated to pay the balance of the contract price to Tallackson.

After unsuccessfully demanding that MTK make final payment, Tallackson sued MTK for breach of contract in the district court. The case was tried to the court on the merits, and judgment was rendered in favor of Tallackson and against MTK in an amount equal to the sum unpaid by MTK under the sale agreement between itself and Tallackson. The court concluded that the sale agreement between the two parties required that MTK pay Tallackson in accordance with the Co-op payment schedule, and did not authorize MTK to refrain from making payment until it actually received monies owed it by the Co-op.[4]

MTK appeals from the district court's judgment to this court and raises three issues:

    "I.    Was MTK's purchase of potatoes from Tallackson conditional on the allowance of MTK to pay for said potatoes as they received their money from International Coop on their own Contract?

   "II.   Did the trial judge incorrectly admit into evidence testimony regarding the price paid for the potatoes by Tallackson to a third party?

 "III.  Should the contract between Tallackson and MTK be reformed in light of the challenged circumstances regarding the payment schedule of the International Coop?"

"2. The seller proceeds (final return after all expenses and adequate evaluation reserves based on a certified annual audit) per hundred weight of potatoes.
"e. Unit retains and deductions referred to in section IV of the growing agreement may

I

First, MTK argues that its agreement with Tallackson conditioned its obligation to pay Tallackson on receipt of the money owed it by the Co-op. Thus, according to MTK, the district court erred in its interpretation of the agreement.

Because this case was tried in the district court without a jury, Rule 52(a), North Dakota Rules of Civil Procedure, determines the scope of our review of the district court's interpretation. In *Metcalf v. Security International Ins. Co.*, 261 N.W.2d 795 (N.D.1978), this court discussed the application of Rule 52(a), N.D.R.Civ.P., in cases involving an interpretation of a written contract:

    "Security asserts that the trial court's interpretation of the written contracts involved findings of fact which cannot be set aside by this court on appeal unless they are clearly erroneous pursuant to Rule 52(a) of the North Dakota Rules of Civil Procedure. Judith asserts, on the other hand, that the district court's interpretation of the written contracts was based solely on documentary evidence and therefore this court's review is not limited by Rule 52(a), N.D.R.Civ.P. Judith contends that this court should independently examine and construe the written contracts.

    "The object of interpreting and construing a contract is to ascertain and give effect to the intention of the parties. *Delzer Construction Co. v. New Marian Homes Corp.*, 117 N.W.2d 851 (N.D.1962). The construction of a written contract to determine its legal effect is always a question of law for the court to decide. *Floyd v. Ring Const. Corporation*, 165 F.2d 125 (8th Cir. 1948); *Connie's Const. v. Fireman's Fund Ins.*, 227 N.W.2d 207 (Iowa 1975). However, the interpretation

    be taken from any of the foregoing payments."

4. The district court issued its findings of fact and conclusions of law in the form of a written opinion.

of the parties' intentions as to the meaning of certain words or phrases in a written contract may involve either a question of law or a question of fact depending on whether or not the interpretation requires the use of extrinsic evidence. If the parties' intentions in a written contract can be ascertained from the writing alone, then the interpretation of the contract is a question of law for the court to decide. See *Grove v. Charbonneau Buick-Pontiac, Inc.*, 240 N.W.2d 853 (N.D. 1976); *Stuart v. Secrest*, 170 N.W.2d 878 (N.D.1969); *Anderson v. First Nat. Bank of Grand Forks*, 6 N.D. 497, 72 N.W. 916 (1897), aff'd 172 U.S. 573, 19 S.Ct. 284, 43 L.Ed. 558 (1899); *Otten v. Stonewall Insurance Company*, 511 F.2d 143 (8th Cir. 1975); *see, also* Annot. 65 A.L.R. 648 (1930). If, however, the parties' intentions cannot be determined from the writing alone and reference must be made to extrinsic evidence, then those questions in regard to which extrinsic evidence is adduced are questions of fact to be determined by the trier-of-fact. See *Farmers Elevator Company v. David*, 234 N.W.2d 26 (N.D.1975); *Otten v. Stonewall Insurance Company, supra; Pleasure Time, Inc. v. Kuss*, 78 Wis.2d 373, 254 N.W.2d 463 (1977); *RTE Corporation v. Maryland Cas. Co.*, 74 Wis.2d 614, 247 N.W.2d 171 (1976); *Blocher v. Mayer Bros. C.*, 127 Minn. 241, 149 N.W. 285 (1914); *Rosenthal v. Ogden*, 50 Neb. 218, 69 N.W. 779 (1897); *see, also*, Annot. 65 A.L.R. 648 (1930)." 261 N.W.2d at 799–800.

■ We hold that the same general principles apply to a court's interpretation of an oral contract. See, e. g., *Curran v. Hastreiter*, 579 P.2d 524 (Alaska 1978); *Jackson v. White*, 556 P.2d 530 (Alaska 1976); *B. B. & S. Construction Co., Inc. v. Stone*, 535 P.2d 271 (Alaska 1975); *Nordin v. Zimmer*, 373 P.2d 738 (Alaska 1962); *Van Ruiten v. Van Ruiten*, 268 Cal.App.2d 619, 74 Cal. Rptr. 186 (1969); 17A C.J.S. *Contracts* § 618, pp. 1256–1258. Obviously, however, the terms of an oral contract can be established only through extrinsic evidence. A determination of these terms, if they are disputed, must therefore be made by the trier of fact, and will be reversed by this court on appeal only if "clearly erroneous." After the terms of the oral contract have been determined, the issue of the parties' intentions, if ascertainable from those terms, involves a question of law for the court to decide, and will be reversed by this court on appeal if erroneous. Yet, if the parties' intentions are not ascertainable from the terms of the oral contract and must therefore be established by extrinsic evidence, the question once again becomes one for the trier of fact and this court will reverse on appeal only if "clearly erroneous."

■ Here, the terms of the oral contract and the intentions of the parties were established through extrinsic evidence consisting of testimony of various witnesses and the introduction into evidence of the mailgram.[5]

---

**5.** MTK cites Section 41–02–14(1), (2), N.D.C.C., and appears to argue that the terms of the confirmatory mailgram became part of the parties' agreement. Section 41–02–14, N.D.C.C. (Uniform Commercial Code § 2–207), provides, in part:

"1. A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

"2. The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

"a. the offer expressly limits acceptance to the terms of the offer;

"b. they materially alter it; or

"c. notification of objection to them has already been given or is given within a reasonable time after notice of them is received."

MTK did not raise this argument in the district court, and we therefore decline to address it. Were it properly raised, however, we would find it without merit. Even if we assume that both Tallackson and MTK are merchants, the last sentence of the mailgram, by itself, can support either party's interpretation of the contract. Thus it does not necessarily contain additional terms. Moreover, if the last sen-

■ The confirmatory mailgram can be found to sustain either party's interpretation of the contract. The district court found, in essence, that the testimony of the parties, taken together with the other evidence, corroborated Tallackson's interpretation of the contract. After examining the transcript of testimony taken at trial, we cannot state that this finding is "clearly erroneous."

## II

■ MTK argues that the district court improperly admitted into evidence, and relied upon it in reaching its decision, Tallackson's testimony that he purchased the potatoes delivered to the Co-op on behalf of MTK from John Hankey for $2.50 per hundredweight. MTK asserts that the admission of, and reliance upon, this "totally immaterial and irrelevant" testimony warrants that we reverse the district court's decision. This argument is without merit.

Rule 401 of the North Dakota Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MTK urged at trial that, among other things, the district court should reform the contract and hold that Tallackson was entitled to recover from MTK only the reasonable value of the potatoes at the time of delivery, rather than the contractual price yet unpaid. Relevant to this issue was Allan Thompson's testimony at trial that the reasonable value of the potatoes was $2.30 or $2.40 per hundredweight. Similarly relevant to this issue was testimony relating to Tallackson's actual cost of procuring the potatoes. This testimony also shed light on the fact of the reasonable value of the potatoes. It made Tallackson's position—presumably that the reasonable value of the potatoes was the contractual price—more probable, and made MTK's position—that the reasonable value of the potatoes was $2.30 or $2.40—less probable.

■ Even assuming, however, that the evidence was irrelevant and therefore inadmissible, we still reject MTK's argument. In *Schuh v. Allery*, 210 N.W.2d 96, 99–100 (N.D.1973), this court wrote:

"We believe that a trial judge, in a nonjury case, should ordinarily admit all evidence which is not clearly inadmissible. A judge who is competent to rule upon the admissibility of evidence can distinguish in his own mind, when deliberating his ultimate decision, between evidence which is admissible and evidence which is not admissible. The introduction of allegedly inadmissible evidence in a nonjury case will rarely be reversible error, and it may often avoid a possible reversal in cases where this court, on appeal, holds that the evidence is admissible.

"We agree with the statement of the Eighth Circuit Court of Appeals in *Builders Steel Co. v. Commissioner of Internal Rev.*, 179 F.2d 377, 379:

"In the trial of a nonjury case, it is virtually impossible for a trial judge to commit reversible error by receiving incompetent evidence, whether objected to or not. *An appellate court will not reverse a judgment in a nonjury case because of the admission of incompetent evidence, unless all of the competent evidence is insufficient to support the judgment or unless it affirmatively appears that the incompetent evidence induced the court to make an essential finding which would not otherwise have been made. . . . On the other hand, a trial judge who, in the trial of a nonjury case, attempts to make strict rulings on the admissibility of evidence, can easily get his decision reversed by excluding evidence which is objected to, but which, on review, the appellate court believes should have been admitted.* " [Emphasis added.]

This court has steadfastly adhered to this principle. See, e. g., *Pulkrabek, Inc. v.*

tence can be construed as creating an additional term—an interpretation implicitly rejected by the district court—it could, in our opinion,

materially alter the contract and therefore not become a part of that contract.

*Yamaha International Corp.*, 261 N.W.2d 657 (N.D.1977).

In its opinion, the district court only once referred to evidence about Tallackson's source of potatoes. In this reference, which is contained in a general discussion of the facts, the district court stated only that Tallackson purchased the potatoes "from a John Hankey," and did not mention the cost of the potatoes to Tallackson. Because of such cursory treatment of this evidence, we do not believe the district judge relied on it in reaching a decision, and he most certainly did not use it "to make an essential finding which would not otherwise have been made." Moreover, there was other competent evidence to support the judgment.

### III

■ Finally, MTK asks this court to invoke, through its equitable authority, the doctrine of reformation in order to reapportion the amount of damages awarded by the district court to Tallackson.[6] MTK argues that because the possibility of the Co-op's inability to pay its members according to its payment schedule was not foreseen by either party prior to the formation of their contract, this court should reform the contract so that each party bears part of the responsibility for the Co-op's inability to honor its obligations.

■ Reformation is proper if, "at the time of the execution of the agreement to sell, both parties intended to say something different from what was said in the instrument." *Cokins v. Frandsen*, 141 N.W.2d 796, 799 (N.D.1966). While "courts of equity have the power to reform written instruments to conform to the true intention of the parties" [*Oliver-Mercer Electric Cooperative, Inc. v. Fisher*, 146 N.W.2d 346, 355 (N.D.1966)], they will not make new contracts by reforming existing contracts in a manner never considered, so obviously not intended by the parties. See, e. g., *Drees Farming Association v. Thompson*, 246 N.W.2d 883 (N.D.1976); *Berry-Iverson Co. of North Dakota v. Johnson*, 242 N.W.2d 126 (N.D.1976); *Hughes Realty Company v. Breitbach*, 98 N.W.2d 374 (N.D.1959).

■ MTK and Tallackson did not intend to form a contract with terms differing

---

**6.** At various points in his brief, the attorney for MTK argues that the doctrines of "impossibility" and "commercial frustration" have extinguished MTK's obligation to pay the contractual price for the potatoes. Neither of these doctrines is apposite.

To establish impossibility, MTK must demonstrate that, among other things, its performance is strictly impossible or impracticable "because of extreme and unreasonable difficulty, expense, injury or loss," [*Restatement of Contracts*, § 454 (1932). See also, e. g., *Transatlantic Financing Corporation v. United States*, 124 U.S.App.D.C. 183, 363 F.2d 312 (1966); *Lloyd v. Murphy*, 25 Cal.2d 48, 153 P.2d 47 (1944); *Restatement of Contracts 2d*, § 281, Comment d, at 50–51 (Tent. Draft No. 9, 1974)] and that the Co-op's failure rendered its performance not only subjectively but also objectively impossible or impracticable [*Restatement of Contracts*, § 455 (1932); *Restatement of Contracts 2d*, § 281, Comment e, at 54 (Tent. Draft No. 9, 1974)]. In other words, MTK must show that it cannot perform and that performance could not be completed by anyone. MTK has satisfied neither of these requirements. Under the contract, MTK obligated itself to pay money. MTK has produced no evidence to indicate that its performance was strictly impossible or impracticable because of extreme and unreasonable difficulty, expense, injury, or loss. Furthermore, disregarding MTK's individual capabilities, which are irrelevant to the issue of objective impossibility and impracticability, we conclude that the obligation to pay money remained both objectively possible and practicable [See *Restatement of Contracts*, § 455, Illustration 1 (1932); *Restatement of Contracts 2d*, § 281, Comment e, at 54 (Tent. Draft No. 9, 1974)].

In the words of *Restatement of Contracts 2d*, § 285, at 77 (Tent. Draft No. 9, 1974), frustration occurs when "after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made." See also, e. g., *Chicago, M., St. P. & P. R. Co. v. Chicago & N. W.*, 82 Wis.2d 514, 263 N.W.2d 189 (1978); *Lloyd v. Murphy, supra; Restatement of Contracts*, § 288 (1932). Here, even if we accept the argument that both parties thought the Co-op would continue to honor its payment schedule, the record does not substantiate a conclusion that the nonoccurrence of this event was a "basic assumption on which the contract was made." We conclude, therefore, that the doctrine of frustration is also inapplicable.

from the terms disclosed during their oral negotiations and confirmed in the mail-gram. Thus the agreement reflects their true intentions, and the doctrine of reformation is inapplicable.[7]

The decision of the district court is affirmed.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.

---

**7.** Because we have rejected MTK's argument on this ground, we do not consider the question whether reformation is proper when the con-

tract at issue is oral, rather than written. See *Restatement of Contracts*, § 504, Comment b, and § 507 (1932).