FILED
IN THE OFFICE OF THE
CLERK OF SUPREME COURT
JANUARY 12, 2021
STATE OF NORTH DAKOTA

# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

## 2021 ND 12

| | |
|---|---|
| R & F Financial Services, LLC, | Plaintiff and Appellant |
| v. | |
| Cudd Pressure Control, Inc., and RPC, Inc., | Defendants and Appellees |
| and | |
| North American Building Solutions, LLC, | Defendant |

## No. 20190287

Appeal from the District Court of Williams County, Northwest Judicial District, the Honorable Benjamen J. Johnson, Judge.

AFFIRMED.

Opinion of the Court by Tufte, Justice.

Joseph A. Turman (argued) and Katrina A. Turman Lang (argued), Fargo, N.D., for plaintiff and appellant.

Trevor A. Hunter (argued) and Kent A. Reierson (on brief), Williston, N.D., for defendants and appellees.

1

# R & F Financial Services v. North American Building Solutions
## No. 20190287

**Tufte, Justice.**

[¶1]   R & F Financial Services, LLC, appeals from a district court order dismissing its claims against Cudd Pressure Control, Inc., and RPC, Inc., and granting Cudd's and RPC's counterclaims and cross claims. On appeal, R & F argues that the court erred in finding the Lease was not a finance lease and, in the alternative, that the court erred in finding the doctrines of impossibility of performance and frustration of purpose to be inapplicable. We affirm.

I

[¶2]   North American Building Solutions, LLC ("NABS") and Cudd Pressure Control, Inc. ("Cudd") became associated with each other when NABS managing member James Morken "stopped in at Cudd['s]" business location. On August, 30, 2011, Cudd and NABS entered into a lease agreement (the "Lease") whereby Cudd agreed to lease from NABS 60 temporary housing modules. Pursuant to the agreement, NABS agreed to deliver and construct the modules on certain real property located in Williams County. The terms of the Lease required Cudd, at its sole expense, to obtain any conditional use permits, variances or zoning approvals "required by any local, city, township, county or state authorities, which are necessary for the installation and construction of the modules upon the Real Property." The Lease was set to commence following substantial completion of the installation of all the modules and was to expire 60 months following the commencement date. Originally, NABS wanted to sell the modules to Cudd, but Cudd did not want to fund the project and wanted to lease the modules.

[¶3]   On April 18, 2012, Cudd accepted 28 modules from NABS pursuant to the Acceptance and Lease Schedule #1 ("Schedule #1"); NABS assigned its interest in the Lease to R & F; and NABS sold the modules to R & F by a bill of sale. Cudd was not a party to the assignment or bill of sale, and Schedule #1 did not mention either document. R & F had purchased NABS's interest in the Lease to provide funding so that NABS would have the capital to complete the

1

project. On June 28, 2012, Cudd accepted the final 32 modules from NABS pursuant to the Acceptance and Lease Schedule #2 ("Schedule #2"), to which R & F was not a party. NABS and Cudd agreed that the new commencement date under the Lease was June 23, 2012.

[¶4] RPC, as the parent company of Cudd, guaranteed Cudd's performance of payment obligations to R & F under section 4 of the Lease. NABS was not a party to the guaranty. There is nothing in the record showing that Cudd or RPC consented to NABS's assignment of its interest in the Lease and sale of the modules to R & F. The Lease was for a set term and did not contain an option for Cudd to purchase the modules at the expiration of that set term. Paragraph 23 of the Lease provides that "in connection with such interpretation and enforcement, this Lease shall be deemed to be a commercial lease."

[¶5] At the time R & F purchased NABS's interest in the Lease, it understood the purpose of the Lease was to fulfill Cudd's need for employee housing. Given the layout of the modules, they were designed for and had limited uses other than housing. Cudd used the modules strictly for housing as required by the Lease. The County required a conditional use permit for workforce housing, and Cudd had been issued a permit allowing for the use of the modules as workforce housing. On May 24, 2012, the City of Williston annexed, among other properties, the Property into the City's corporate limits.

[¶6] In September of 2013, the City adopted Resolution 13-127, which applied to all workforce housing facilities subject to the City's jurisdiction, and declared that all workforce housing was temporary and extension of permits was subject to review and requirements. Therefore, a workforce housing facility could legally operate in the City post-annexation until its County-issued permit expired. Permits could be extended for a period of 24 months, assuming certain requirements were met. In December of 2013, the City modified the expiration date policy and extended all approvals for workforce housing facilities to December 31, 2015, such that all permits would expire the same day.

2

[¶7] In September of 2015, the termination date for all workforce housing facility permits was again extended to July 1, 2016, by motion. Ordinance No. 1026 codified the September motion, and under it, an existing workforce housing facility had to have been in full compliance with the City in order to be eligible for the extension. In December of 2015, Cudd complied with these requirements, and the City extended Cudd's permit for the maximum time permitted to July 1, 2016. Cudd sent a letter to NABS stating that it viewed the Lease as being terminated by operation of law as of July 1, 2016.

## II

[¶8] Whether the transaction was a commercial lease or a finance lease is a question of law. This Court has stated the standard of review in interpreting contracts as follows:

> The parties' intent is ascertained from the writing alone if possible. The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity. When the parties' intent can be determined from the contract language alone, interpretation of a contract presents a question of law. When an agreement has been memorialized in a clear and unambiguous writing, extrinsic evidence should not be considered to ascertain intent. When a contract's language is plain and unambiguous and the parties' intentions can be ascertained from the writing alone, extrinsic evidence is not admissible to alter, vary, explain, or change the contract. If a contract is ambiguous, extrinsic evidence may be considered to determine the parties' intent, and the contract terms and parties' intent become questions of fact.

*Big Pines, LLC v. Baker*, 2020 ND 64, ¶ 7, 940 N.W.2d 616. At oral argument, the parties agreed that the Lease is unambiguous.

## III

[¶9] "Finance lease" is defined by statute as a lease in which:

(1) The lessor does not select, manufacture, or supply the goods;

(2) The lessor acquires the goods or the right to possession and use of the goods in connection with the lease; and

(3) (a) The lessee receives a copy of the contract by which the lessor acquired the goods or the right to possession and use of the goods before signing the lease contract;

(b) The lessee's approval of the contract by which the lessor acquired the goods or the right to possession and use of the goods is a condition to effectiveness of the lease contract;

(c) The lessee, before signing the lease contract, receives an accurate and complete statement designating the promises and warranties, and any disclaimers of warranties, limitations, or modifications of remedies, or liquidated damages, including those of any third party such as the manufacturer of the goods, provided to the lessor by the person supplying the goods in connection with or as part of the contract by which the lessor acquired the goods or the right to possession and use of the goods; or . . . .

N.D.C.C. § 41-02.1-03(1)(g). R & F argues it is the lessor of a finance lease to which Cudd is the lessee. R & F argues "that the transaction between NABS and Cudd, both at the outset and following the injection of funding by R & F, constituted a finance lease." The first element of a finance lease as defined by statute is that the "lessor does not select, manufacture, or supply the goods." N.D.C.C. § 41-02.1-03(1)(g)(1). Here, NABS both manufactured and supplied the goods. Additionally, the official comment to subsection (g) states, "A finance lease is the product of a three party transaction." N.D.C.C. § 41-02.1-03(1)(g) cmt. At the outset of the transaction, the only parties to the Lease were Cudd and NABS. Therefore, the transaction, at the outset, was not a finance lease.

[¶10] After R & F funded the transaction, it still did not qualify as a finance lease. R & F met the first requirement under the statute because it did not select, manufacture, or supply the modules. R & F, however, acquired the modules through the bill of sale not involving Cudd months after the Lease had been signed. The example contained in official comment (g) finds that a lessor acquires the goods in connection with the lease when the lessor purchases the goods simultaneously with leasing them back to the seller. NABS had already

4

built and delivered to Cudd 28 modules prior to receiving any funds from R & F under the assignment. The managing partner of NABS testified that it needed the financing in order to honor its commitment to Cudd and that a failure to acquire funding could have resulted in a breach of the Lease. On this record, we conclude, R & F did not acquire the modules in connection with the Lease.

[¶11] In defense of its argument that R & F's funding transformed the transaction into a finance lease, R & F points to the extensive experience of its principals with finance leasing. Official comment (g) states: "Unless the lessor is comfortable that the transaction will qualify as a finance lease, the lease agreement should include provisions giving the lessor the benefits created by the subset of rules applicable to the transaction that qualifies as a finance lease under this Article." N.D.C.C. § 41-02.1-03(1)(g) cmt. R & F argues that it would have included such a statement if it had not been comfortable that the transaction would qualify as a finance lease. The Lease stated that "in connection with such interpretation and enforcement, this Lease shall be deemed to be a commercial lease." The official comment counsels that neither R & F nor its principals should have been comfortable that an agreement which stated it "shall be deemed to be a commercial lease" would qualify as a finance lease.

[¶12] R & F argues that the schedules, assignment, and guarantee transform the Lease into a finance lease. As part of a single transaction, all contracts entered into by NABS and Cudd must be construed together, and only the provisions in the latter contracts which are inconsistent with the prior contracts will supersede. N.D.C.C. § 9-07-07; *Metcalf v. Security Int'l Ins. Co.*, 261 N.W.2d 795, 800 (N.D. 1977) (citations omitted). Those provisions in all the contracts which are not inconsistent remain effective and must be construed together. *Id.*

[¶13] Here, Schedule #1 entered into by NABS and Cudd acknowledged Cudd's acceptance of the first 28 modules and established that prorated rent would be due "per unit until the Commencement Date of the Lease." This is consistent with the terms of the Lease which state, "Lessor shall notify Lessee as each individual module is completed and ready for occupancy, at which time Lessee

5

shall be entitled to take possession of such completed module. Upon taking possession of each individual module, Lessee shall begin paying Lessor pro rata rent as set forth in paragraph 4(a) of this Lease." Schedule #1 acknowledged that prorated rent for the 28 completed modules commenced on April 16, 2012. This schedule further provides that it "forms a part of a Lease between NABS and Cudd dated: August 30th, 2011." While Schedule #1 states that the prorated rent payments are to be made to R & F, it was not a party to the schedule. This schedule updated the lease to reflect a new timeline, stating that "the Modules will be constructed and installed in a continuous construction phase of approximately three (3) months . . . ." Schedule #1 is inconsistent with and supersedes the Lease only to the extent that it acknowledged the delay in installation and construction of the modules and provided that all rent payments due under Schedule #1 and the Lease were to be paid to R & F instead of NABS.

[¶14] Schedule #2 is an acceptance of the final 32 modules and specifies a commencement date of June 23, 2012. This schedule states, "Prorated rent on the modules is due and owing from the date of occupancy of the individual modules by Cudd," which is consistent with the Lease. Cudd again acknowledges that all rent payments shall be paid to R & F. Schedule #2 is not inconsistent with the Lease or Schedule #1. Further, neither schedule overrides the provision in the Lease that states it is to be construed as a commercial lease.

[¶15] R & F also argues the Lease must be interpreted together with the guaranty. The guaranty states that "the undersigned RPC, Inc., (the 'Guarantor') hereby guaranties to R & F the performance of Cudd's payment obligations to R & F under Section 4 of the above-referenced Lease Agreement." NABS is not a party to the guaranty, and therefore the Lease cannot be construed together with the guaranty. N.D.C.C. § 9-07-07. Similarly, Cudd was not a party to the assignment or the bill of sale and did not approve either of them. Therefore, the assignment and bill of sale are not contracts between these parties and the Lease cannot be construed together with those documents.

6

[¶16] R & F argues that, at the very least, the Lease should be deemed severable or divisible and a finance lease was created as to the 32 modules accepted under Schedule #2. This argument was not raised to the district court, was not expressly considered by the court, and we do not address it here.

[¶17] R & F argues that if the transaction is not a finance lease, the court erred in finding that the doctrines of impossibility of performance and frustration of purpose were applicable. The district court's order applied the same findings of fact and conclusions of law to support its decision that both were applicable: that the annexation of the property by the City and the use of the modules for housing becoming illegal was unforeseeable, and it was a basic assumption of the parties that these events would not occur.

[¶18] "This Court has recognized the doctrine of frustration of purpose may be used to avoid all or part of a contractual claim." *City of Harwood v. City of Reiles Acres*, 2015 ND 33, ¶ 18, 859 N.W.2d 13 (citing *Silbernagel v. Silbernagel*, 2011 ND 140, ¶ 13, 800 N.W.2d 320; *WFND, LLC v. Fargo Marc, LLC*, 2007 ND 67, ¶ 18, 730 N.W.2d 841). The doctrine of frustration of purpose is applicable when "after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made." *WFND, LLC,* 2007 ND 67, ¶ 18 (quoting *Tallackson Potato Co., Inc. v. MTK Potato Co.*, 278 N.W.2d 417, 424 n.6 (N.D. 1979)); *see also* Restatement (Second) of Contracts § 265 (1981) (adopted version).

[¶19] Our cases cite favorably to the three requirements for frustration of purpose described in the Restatement. *City of Harwood*, 2015 ND 33, ¶ 18 (citing Restatement (Second) of Contracts § 265 comment (a) (1981)). First, the purpose that is frustrated must have been "a party's principal purpose" in making the contract. *Id.* Here, the terms of the Lease limited Cudd, without prior written consent of NABS, to using the modules for employee housing. Further, Morken testified that the modules were designed with laundry facilities, living spaces, kitchens, bedrooms, and bathrooms. Cudd intended to and did use the modules for employee housing. Therefore, the principal purpose of the Lease was to provide housing for Cudd's employees. Second, the

purpose must be "substantially frustrated." *Id.* The Lease terms provided that Cudd could not move the modules from the Property. The City's regulations prevented Cudd from applying for the necessary permit and terminated all workforce housing inside the City's jurisdiction, substantially frustrating Cudd's use of the modules as workforce housing.

[¶20] Third, the non-occurrence of the frustrating event must have been "a basic assumption on which the contract was made." *Id.; Tallackson*, 278 N.W.2d at 424 n.6 (citing Restatement of Contracts 2d § 285, at 77 (Tent. Draft No. 9, 1974)). R & F argues that it was foreseeable at the time of contracting that the County may terminate workforce housing. "The foreseeability of the event is . . . a factor in that determination, but the mere fact that the event was foreseeable does not compel the conclusion that its non-occurrence was not such a basic assumption." Restatement (Second) of Contracts § 265 comment (a) (1981). Here, it was the combination of the City annexing the Property and enacting its resolutions and ordinances which substantially frustrated Cudd's purpose in entering into the Lease. Morken testified that the parties did not discuss a potential annexation of the Property by the City or that Cudd would not be able to apply for a conditional use permit. The Lease put the burden on Cudd to acquire a permit, which required that Cudd be able to apply for a permit. Further, the Lease forbade Cudd from using the modules for anything other than employee housing without written consent, the modules were designed to be used for housing, and the Lease forbade Cudd from moving the modules off the Property. While the City's actions may have been foreseeable, the district court findings that it was a basic assumption of the parties that such actions would not occur was not clearly erroneous. Lastly, the frustrated party must not be at fault. *WFND, LLC*, 2007 ND 67, ¶ 18 (citing Restatement (Second) of Contracts § 265 (1981)). Here, Cudd did not petition the City to annex the Property and cease granting permits for workforce housing. Therefore, Cudd was not at fault. The court did not err in concluding the doctrine of frustration applied. We need not reach the district court's alternative rationale relying on the doctrine of impossibility.

## IV

[¶21] We affirm.

[¶22] Jon J. Jensen, C.J.
Gerald W. VandeWalle
Daniel J. Crothers
Lisa Fair McEvers
Jerod E. Tufte