SUPERIOR COURT 
 
 UMNV 205–207 NEWBURY, LLC v. CAFFÉ NERO AMERICAS INC.

 
 Docket:
 2084CV01493-BLS2
 
 
 Dates:
 February 8, 2021
 
 
 Present:
 Kenneth W. Salinger, Justice of the Superior Court
 
 
 County:
 SUFFOLK, ss.
 

 
 Keywords:
 MEMORANDUM AND ORDER ON PLAINTIFF’S MOTION FOR PARTIAL SUMMARY JUDGMENT
 
 

             UMNV 205–207 Newbury, LLC, leased retail space to Caffé Nero Americas, Inc. One condition was that Caffé Nero could use the leased premises only to operate a “Caffé Nero themed café” and not for any other purpose. In March 2020 the Governor barred Massachusetts restaurants from allowing on-premises consumption of food or beverages, indoors or outside. As a result Caffé Nero temporarily closed its Newbury Street café and stopped paying rent. UMNV responded by terminating the lease and then bringing a summary process eviction action. Caffé Nero vacated the premises in late October.
            In this action, UMNV seeks to recover unpaid rent plus interest and “administrative expenses” for the months that Caffé Nero continued to occupy the premises, liquidated damages for the rest of the 15-year lease term, and attorneys’ fees and expenses.
            UMNV has moved for partial summary judgment as to liability for breach of contract and as to the amount of damages, interest, attorneys’ fees, and litigation costs it claims through the date that Caffé Nero left the premises. The motion does not address claimed liquidated damages thereafter.
            The Court concludes UMNV’s motion is without merit, and will instead grant partial summary judgment in Caffé Nero’s favor. Under the doctrine of frustration of purpose, Caffé Nero’s obligation to pay rent was discharged while it was barred from letting customers drink or eat inside the leased premises, at least from March 24 to June 22, 2020. Therefore Caffé Nero did not breach the Lease by not paying rent for this period, UMNV’s notice of default was in error and not effective, and UMNV acted improperly in May when it terminated the lease for non-payment of rent in April. Neither the force majeure provision (which addresses impossibility but not frustration of purpose) nor the independent covenant provision bars this defense. Caffé Nero is entitled to
 
                                                            -1-
 
judgment in its favor on these issues, including appropriate declaratory relief, even though it did not file a cross-motion for summary judgment.[1]
            Though UMNV also moved for partial summary judgment as to its claim for holdover rent from the period from June 22 to October 29, 2020 (the day that Caffé Nero vacated the premises), that issue cannot be resolved on summary judgment.[2]
            1. Factual Background. The following facts are undisputed for the purpose of deciding UMNV’s motion for partial summary judgment.
            The parties entered into a lease of certain space in 205–207 Newbury Street in Boston for a fifteen-year period starting June 1, 2017. This Lease defines the leased premises as consisting of roughly 2,630 square feet3 inside the basement or “walk-down” level of the building. Caffé Nero also had the non-exclusive right to use common indoor and outdoor areas on UMNV’s property.
            This Lease provides that Caffé Nero may use the leased premises “solely” for “[t]he operation of a Caffé Nero themed café under Tenant’s Trade Name and for no other purpose.” It also says that Caffé Nero was required to operate this café “in a manner consistent with other Caffé Nero locations in the Greater Boston area,” to serve food and beverages “of first-class quality,” and could only offer take-out  sales  “from  its  regular  sit-down  restaurant  menu.”  The business model that Caffé Nero followed at its other locations, and thus by contract was required to follow in this space, was to serve great coffee and food that customers could enjoy and linger over in a comfortable indoor space.
 
---------------------------
 
[1] See Mass. R. Civ. P. 56(c) (“Summary judgment, when appropriate, may be rendered against the moving party.”); Targus  Group Intern., Inc. v. Sherman,  76 Mass. App. Ct. 421, 422 n.2 & 428-434 (2010) (affirming summary judgment in favor of non-moving plaintiff on breach of contract claim based on court’s interpretation of written agreement).
 
[2] That part of UMNV’s claims, like the claim for liquidated damages as to the lease period that remained after Caffé Nero moved out, turns in part on whether UMNV could terminate the lease without giving written notice regarding alleged non-payment of rent after June 22, and whether Caffé Nero can establish that it was wrongfully evicted and therefore has a complete defense to UMNV’s remaining claims under § 11.9 of the Lease. Whether either party is entitled to recover any attorneys’ fees and expenses incurred as a result of this litigation is another open issue that the Court cannot resolve now.
 
[3]The estimated square footage was changed in the First Amendment to Lease.
 
                                                            -2-
 
Caffé Nero took almost a year and spent $1.3 million to build out the space.   It opened and began operating the Newbury Street Caffé Nero in June 2018.
            In late March 2020 the COVID-19 pandemic forced Caffé Nero either to shift to a take-out business model or close entirely. By order of Governor Baker, as of noon on March 24, 2020, Caffé Nero—like all other restaurants and cafés in Massachusetts—was barred from allowing any “on-premises consumption of food or beverages,” and instead could only offer food or beverages for take-out or delivery.[4] The Governor extended this order several times.
            Caffé Nero wrote to UMNV a few days later, saying that it could not pay rent while its business remained closed by government order and asking UMNV to waive all rent while the business was required to remain closed. Caffé Nero did not pay its rent for April 2020.
UMNV responded in writing on April 8, 2020; it declined to waive or reduce any payments due under the Lease, and notified Caffé Nero that it would be in default unless it paid the April rent within five days. Caffé Nero did not do so. On May 19, 2020, UMNV sent another letter that purported to terminate the Lease, and ordered Caffé Nero to “quit and surrender the Premises,” because Caffé Nero had allegedly defaulted by not paying rent for April; the letter also stated that Caffé Nero’s failure to pay rent for May was an additional default.
            Section 11.1 of the Lease provides that Caffé Nero would be in default if it failed to pay any rent when due and did not remedy the non-payment within five days after receiving written notice of it from UMNV. This section goes on to provide that UMNV could terminate the Lease if Caffé Nero was in default. And the Lease provides that it “shall be governed by and construed in accordance with” Massachusetts law.
            There is no evidence in the summary judgment record that UMNV sent any other notice giving Caffé Nero five days to remedy any later rent deficiency or purporting to terminate the Lease for any other alleged default.
In early June the Governor issued a further order allowing phased reopening of businesses that had been closed due to the pandemic.[5] Under that order,
 
---------------------------
 
[4]See COVID-19 Order No. 13, issued March 23, 2020, at 9:25 a.m.; it is available at https://www.mass.gov/doc/march-23-2020-essential-services-and-revised- gatherings-order/download.
 
[5]See COVID-19 Order No. 37, issued June 6, 2020, available at https:// www.mass.gov/doc/june-6-2020-phase-ii-reopening/download.
 
                                                            -3-
 
Caffé Nero was able to begin offering “outdoor table service”—but still barred from letting any customers inside the leased premises—on June 8, 2020. This was the start of what the Governor called Phase 2, Step 1, of his reopening plan. Restaurants were first able to resume limited indoor table service on June 22, 2020, when the Governor moved Massachusetts to Phase 2, Step 2, of that plan.[6]
            Caffé Nero reopened its Newbury Street location on June 8, and made sales at or from those premises during June, July, August, and September 2020. The Court infers and therefore finds that from June 8 through June 21 Caffé Nero only offered outside table service and takeout, and that it did not let any customers back inside the premises until June 22.
            Once it reopened the Newbury Street operation, Caffé Nero offered to pay UMNV a higher percentage of sales in lieu of fixed rent, to cover UMNV’s out- of-pocket costs including real estate taxes, building insurance, and maintenance. UMNV rejected that offer. Caffé Nero continued to pay no rent, even though it still occupied the premises and had reopened its business.
UMNV brought a summary process action in Boston Municipal Court, seeking to evict Caffé Nero from the premises, on June 29, 2020[7]—seven days after Caffé Nero was first allowed to resume indoor, on-premises service. It filed this action for damages on July 7, 2020.
At some point Caffé Nero concluded that UMNV was unwilling to negotiate. It therefore made plans to vacate the leased premises. After removing its equipment and furnishings, and also demolishing and removing the walk-in
 
---------------------------
 
[6]See COVID-19 Order No. 40, issued June 19, 2020, available at https:// www.mass.gov/doc/reopening-phase-2-step-2-order/download. Though this order is not included in the summary judgment record, the Court may and does take judicial notice of it. See generally Commonwealth v. Greco, 76 Mass. App. Ct. 296, 301 n.9, rev. denied, 457 Mass. 1106 and 458 Mass. 1105 (2010) (court may take judicial notice of facts “capable of accurate and ready determination by resort to resources whose accuracy cannot reasonably be questioned”) (quoting Mass. Guide Evid. § 201(b)(2); see also Foster v. Commissioner of Correction, 484 Mass. 698, 729 n.20 (2020) (taking notice of publicly available reports by the Department of Public Health); Fitchburg Gas and Elec. Light Co. v. Department of Pub. Utils., 395 Mass. 836, 856 (1985) (taking notice of DPU order).
 
[7]The Court takes notice of this filing date from the Boston Municipal Court’s docket in UMNV 205–207 Newbury, LLC v. Caffé Nero Americas, Inc., 2001SU00010. A court may take judicial notice of the records in a related judicial action. Jarosz v. Palmer, 436 Mass. 526, 530 (2002).
 
                                                            -4-
 
freezer and refrigerator as requested by UMNV, Caffé Nero returned the keys and vacated the premises on October 29, 2020.
Caffé Nero paid UMNV no rent for the period from April to October 2020.
            2. Legal Background—Frustration of Purpose. Under the legal doctrine known as “frustration of purpose,” a party to a lease or other contract is excused from performing its contractual obligations “when an event neither anticipated nor caused by either party, the risk of which was not allocated by the contract, destroys the object or purpose of the contract, thus destroying the value of performance.” Chase Precast Corp. v. John J. Paonessa Co., Inc., 409 Mass. 371, 374 (1991). In other words:
Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.
Id. at 375, quoting Restatement (Second) of Contracts § 265 (1981).
            A classic example of frustration of purpose with respect to a tenancy occurs where the leased premises are destroyed by something beyond the tenant’s control. If that were to happen, it would still be possible for the tenant to perform its contractual obligation of paying rent. But since the purpose to be achieved by paying rent has been completely frustrated, the tenant is excused from further performance unless the lease clearly allocates the risk of that event to the tenant. See Restatement § 265, supra, comment a, illustration 3.
            Frustration will similarly discharge an obligation to pay rent where a government order or regulation bars certain conduct or economic activity, it thereby substantially frustrates the principal purpose of the contract, and the non-occurrence of such an order or regulation was a basic assumption underlying the contract. See, e.g., R & F Fin. Servs., LLC v. Cudd Pressure Control, Inc., N.W.2d , 2021 ND 12, ¶¶ 17–21, 2021 WL 99733, at *4–*5 (N.D. 2021) (where party leased modules to be used only for employee housing at specified location, duty to pay rent was discharged by frustration of purpose when city annexed the property and its ordinances barred such workforce housing); Restatement § 265, supra, comment a, illustration 4 (where business rented neon signs to advertise in windows, duty to pay rent would be discharged by frustration of purpose if new regulation prohibits lighting of such signs).
 
                                                            -5-
 
            Frustration of purpose has some things in common with the related doctrine of impossibility of performance, but applies in different circumstances. See Chase Precast, 409 Mass. at 374. Under impossibility, performance is excused where the contracting parties assumed that something would continue to exist, neither party guaranteed that thing would continue to exist, and performance becomes impossible because the thing was destroyed through no fault of either party. Id. at 373. Under frustration, in contrast, performance is excused even though it is possible for the party to perform its contractual obligations, but the expected value of that performance has been destroyed by an unforeseeable event. Id. at 374. “The principal question in both kinds of cases remains whether an unanticipated circumstance, the risk of which should not fairly be thrown on the promisor, has made performance vitally different from what was reasonably to be expected.” Id.
            In sum, whether “frustration of purpose” excuses a party from continuing to perform contractual obligations turns on (i) what was the main purpose of the contract, (ii) has some event caused a change in circumstances such that continued performance can no longer achieve that purpose, and the value to the party of continuing to perform has been destroyed, (iii) was the non- occurrence of that event a basic assumption of the contract, and (iv) did the contract allocate the risk of that event to the party seeking to be excused from performance. Chase Precast, 409 Mass. at 374–375 & n.4. “The foreseeability of the event is ... a factor in that determination, but the mere fact that the event was foreseeable does not compel the conclusion that its non-occurrence was not such a basic assumption.” Restatement (Second) of Contracts § 265 comment (a) (1981).
            In most cases the evaluation of these factors must be resolved by trial. See Chase Precast, 409 Mass. at 376. That is because summary judgment is not available when “a reasonable jury could return a verdict for the nonmoving party.” Cf. Dennis v. Kaskel, 79 Mass. App. Ct. 736, 741 (2011), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
            But where the material facts are not in dispute, and “no rational view of the evidence” permits a finding that a contractual obligation either was or was not discharged for frustration of purpose, then a judge may decide the issue as a matter of law at the summary judgment stage. Cf. Petrell v. Shaw, 453 Mass. 377, 381 (2009) (“Ordinarily, summary judgment is not an appropriate means to resolve claims of negligence because the question is usually one of fact.
 
                                                            -6-
 
            However, a judge may decide the issue as a matter of law when no rational view of the evidence permits a finding of negligence.”) (citation omitted).
            3. Analysis. This is the rare case in which the summary judgment record establishes that performance under a contract was excused for frustration of purpose, at least for a period of time.
            3.1. Applying the Frustration Doctrine. The undisputed facts establish that Caffé Nero’s continuing obligation to pay rent was discharged at least from March 24 to June 22, 2020, because the entire purpose of the Lease was completely frustrated while the Governor’s COVID-19 orders barred restaurants from serving customers indoors. As a result, (i) UMNV’s written notices asserting that Caffé Nero had breached the Lease by not paying the April 2020 rent and was in default for still not making that rent payment within five days after the first notice were both wrong, (ii) Caffé Nero was not in default under the Lease as of May 19, 2020, and (iii) UMNV’s purported termination of the Lease on May 19, 2020, was invalid.
            The summary judgment record establishes that all the elements of frustration of purpose were present in this case.
            The main object or purpose of this contract is not in dispute. The Lease provides that Caffé Nero could use the leased premises only to operate a café with a sit- down restaurant menu “and for no other purpose.” The entire purpose of the Lease was for Caffé Nero to use space inside the basement or walk-down level of UMNV’s building to serve high quality coffee, other drinks, and food to customers who could sit and consume them on the premises.
            It is also undisputed that this purpose was destroyed or frustrated while the Governor’s COVID-19 orders barred Caffé Nero from allowing customers to consume food or drink inside the leased premises.
            Since the Lease limited the permissible use of the leased space to a single purpose, it cannot be disputed that Caffé Nero’s continued ability to operate a café at the leased premises, and the absence of government orders barring all restaurants from serving customers inside, was a basic assumption underlying the Lease. And there is no evidence that the risk of a global viral pandemic coming to Massachusetts and leading to a government order shutting down
 
                                                            -7-
 
the entire restaurant industry was something the parties contemplated when they entered into the Lease. Indeed, UMNV implicitly concedes the point.[8]
            If UMNV had allowed Caffé Nero to use the leased premises for other purposes not barred by government order, then the fact that Caffé Nero’s intended use was frustrated might not have discharged its obligation to pay rent. Cf. Karaa v. Kuk Yim, 86 Mass. App. Ct. 714, 717–718 & n.9 (2014) (no frustration of purpose where defendant leased home with intent to send children to school in Belmont, family could not get visas and thus could not reenter the United States, and defendant knew of and voluntarily assumed that risk). But where, as here, government action bars the only permitted or possible use of the leased property, and there is no evidence that the lessor voluntarily assumed that risk, then “the use of the leased property intended by the parties is frustrated.” Restatement (Second) of Property, Land. & Ten. § 9.3 (1977); accord R & F Fin. Servs., supra, 2021 WL 99733, at *4–*5.
            Finally, nothing in the Lease allocated the risk of this unforeseen event to Caffé Nero. UMNV insists that the defense of frustration of purpose is barred by the force majeure and independent covenant  provisions.  The  Court  disagrees.  As explained below, neither of these provisions addresses the possibility of frustration of purpose, and neither of them allocates to Caffé Nero the unforeseen risk that a global pandemic could lead to government orders that bar Caffé Nero from operating a café on the leased premises.
            3.2. The Force Majeure Provision, in § 12.13.C of the Lease, states in relevant part (emphasis added) that:
Neither the Landlord nor the Tenant shall be liable for failure to perform any obligation under this Lease, except for the payment of money, in the event it is prevented from so performing by … order or regulation of or by any governmental authority … or for any other cause beyond its reasonable control, but financial inability shall never be deemed to be a cause beyond a party’s reasonable control …, and in no event shall either party be excused or delayed in the payment of any money due under this Lease by reason of any of the foregoing.
 
---------------------------
 
[8]UMNV does not contend the parties anticipated the risk that Massachusetts restaurants would be forced to close for public health reasons. It instead argues that the undisputed fact that this risk was not anticipated is immaterial because the Lease bars Caffé Nero from invoking the doctrine of frustration of purpose.
 
                                                            -8-
 
The Court concludes that this provision is unambiguous, and that its meaning is therefore a question of law for the Court to decide.[9]
            This force majeure provision says that generally neither UMNV nor Caffé Nero is liable for breach of contract if they are prevented from performing by any cause beyond its reasonable control, but it includes two important exceptions. First, financial inability shall never be considered a cause beyond a party’s control. Second, failure to pay rent or other money due under the Lease will never be excused on the ground that a party was prevented from making the payment by some cause beyond its control. The phrase “by reason of any of the foregoing” at the end of the provision refers to a party being “prevented from … performing by” any of the listed risks or any other “cause beyond its reasonable control.”
            Thus, the force majeure provision addresses the risk that performance may become impossible, but does not address the distinct risk that the performance could still be possible even while main purpose of the Lease is frustrated by events not in the parties’ control.
            The Lease as a whole provides confirmation that the force majeure provision does not address possible frustration of purpose. Separate provisions in Article X address a classic cause of frustration of purpose—the possibility that damage to or destruction of the leased premises might interfere with Caffé Nero’s ability to operate its business there. Those provisions give Caffé Nero certain rights to abatement of rent and to terminate the Lease if the premises are damaged or destroyed. The effect of these provisions is to limit Caffé Nero’s rights under the doctrine of frustration of purpose; in the event that the leased premises were unusable because they were physically damaged or destroyed, the obligation to pay rent would only be reduced or excused to the extent that UMNV was made whole by insurance, and UMNV would have 120 days to
 
---------------------------
 
[9]“If a contract … is unambiguous, its interpretation is a question of law that is appropriate for a judge to decide[.]” Seaco Ins. Co. v. Barbosa, 435 Mass. 772, 779 (2002). “Whether a contract is ambiguous is also a question of law.” Eigerman v. Putnam Investments, Inc., 450 Mass. 281, 287 (2007). “[A]mbiguity is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other’s.” Indus Partners, LLC v. Intelligroup, Inc., 77 Mass. App. Ct. 793, 795 (2010) (affirming summary judgment), quoting Jefferson Ins. Co. v. Holyoke, 23 Mass. App. Ct. 472, 475 (1987).
 
                                                            -9-
 
substantially repair or restore the premises before Caffé Nero would have the right to terminate the Lease.
            There is no inconsistency between these provisions concerning one potential cause of frustration of purpose and the force majeure provision addressing impossibility of performance. And, indeed, nothing in § 12.13.C says that Article X is an exception to the force majeure rules that the parties negotiated. Because it is not; frustration of purpose is a different issue, arises under different circumstances, and is not addressed by the force majeure provision.
            3.3. The Independent Covenants Provision, in § 12.13.J of the Lease, says that Caffé Nero’s obligations are “separate and independent covenants and agreements,” so that any rent owed by Caffé Nero “shall continue to be payable in all events” unless the Lease is terminated.
            The effect of this provision is to negate the common law rule of mutually dependent covenants, under which a landlord’s material breach of a commercial lease may be an affirmative defense to a claim for non-payment of rent. See Shawmut-Canton LLC v. Great Spring Waters of America, Inc., 62 Mass. App. Ct. 330, 339 (2004).[10]
            That is not the issue here. Whether Caffé Nero’s obligation to pay rent was temporarily discharged due to frustration of purpose does not turn on whether UMNV materially breached its lease obligations. As discussed above, Caffé Nero’s obligations were discharged because of the effect of the Governor’s
 
---------------------------
 
[10]In 2002, the Supreme Judicial Court “abandon[ed] the common-law rule of independent covenants in commercial leases in favor of the modern rule of mutually dependent covenants as reflected in the Restatement (Second) of Property (Landlord and Tenant) § 7.1 (1977).” Wesson v. Leone Enterprises, Inc., 437 Mass. 708, 709 (2002). Under the old rule, a commercial tenant’s covenant to pay rent was independent from the Landlord’s covenants, and the Tenant was relieved from its obligations—including its obligation to pay rent—“only by actual or constructive eviction.” Id., 437 Mass. at 715, quoting Barry v. Frankini, 287 Mass. 196, 201 (1934). Today, the general rule is that a commercial tenant may terminate the lease, and thus stop paying rent, if the landlord does not perform a promise that was a significant inducement in the making of a lease, within a reasonable time after being asked to do so. Id., 437 Mass. at 720. However, this new rule that commercial leases consist of mutually dependent covenants does not apply where “the parties to a lease validly agree otherwise.” Wesson, 437 Mass. at 720 (quoting Restatement § 7.1).
 
                                                            -10-
 
COVID-19 orders, even though UMNV continued to perform all of its obligations under the Lease.
            UMNV nonetheless insists that the language in § 12.13.J stating that Caffé Nero had to keep paying rent “in all events”—and “without setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense excepts as specifically set forth” in the Lease—bars any application of the doctrine of frustration of purpose. And it asserts that similar language in § 3.2, stating that rent is to be paid “without setoff, deduction, counterclaim or defense” has the same effect.
The Court disagrees.
            It would be improper to consider the “in all events” and “without defense” language as if it stood alone. “The words of a contract must be considered in the context of the entire contract rather than in isolation.” General Convention of the New Jerusalem in the United States of Am., Inc. v. MacKenzie, 449 Mass. 832, 835 (2007). As with any contract concerning a business venture, the Court must construe the Lease in a manner that will give it “effect as a rational business instrument and … carry out the intent of the parties.” Robert and Ardis James Foundation v. Meyers, 474 Mass. 181, 188 (2016), quoting Starr v. Fordham,     420 Mass. 178, 192 (1995). And “the parties’ intent ‘must be gathered from a fair construction of the contract as a whole and not by special emphasis upon any one part.’ ” Kingstown Corp. v. Black Cat Cranberry Corp., 65 Mass. App. Ct. 154, 158 (2005), quoting Ucello v. Cosentino, 354 Mass. 48, 51 (1968), and Crimmins & Peirce Co. v. Kidder Peabody Acceptance Corp., 282 Mass. 367, 375 (1933).
            It would have made no business sense for the parties to enter into a lease providing that Caffé Nero may only use the leased premises for one narrow purpose, but must keep paying rent even if the only permissible use is no longer allowed or possible. As discussed above, the parties recognized as much when they negotiated and agreed to the Article X provisions specifying how frustration of purpose principles would apply in the event that the leased premises were damaged or destroyed. The fact that the parties did not think to address the possibility that a global pandemic might lead to government orders barring restaurants from serving customers does not mean they intended to bar application of the frustration doctrine in these circumstances.
 
                                                            -11-
 
Therefore, the “in all events” and “without defense” language cannot reasonably be construed as barring application of the doctrine of frustration of purpose.
ORDER
            On Plaintiff’s motion for partial summary judgment, the Defendant is entitled to partial summary judgment in its favor as follows. When final judgment enters, it shall include the following declarations: (i) Defendant’s obligation to pay rent under the parties’ Lease was discharged under the doctrine of frustration of purpose from March 24 to June 22, 2020, and during any other period when Defendant was barred by government order concerning the COVID-19 pandemic not to allow any consumption of food or beverage within the lease premises; (ii) Defendant was not in default under the Lease as of May 19, 2020; and (iii) the written notice of termination issued by Plaintiff on May 19, 2020, was therefore not effective.
Plaintiff’s motion for partial summary judgment is otherwise denied.
/s/@Kenneth W. Salinger, Justice of the Superior Court
@February 8, 2021
 
                                                            -12-
 
 
xxz